[No. 18443. Department One. April 22, 1924.]

THE STATE OF WASHINGTON, *Respondent*, v. J. D. LYDA, *Appellant*.[1]

CRIMINAL LAW (140½) — EVIDENCE — CONFESSIONS — AIDERS AND ABETTORS. The confession of a confederate in arson as to his own guilt showing what was done by him in the commission of the offense is relevant and admissible against an aider and abettor; the rule in conspiracy having no application.

SAME (140½). It is reversible error in receiving the confession of a confederate in arson as to his own guilt and what was done by him in the commission of the offense, to receive statements and recitals as to defendant's acts in aiding and abetting in the offense which were hearsay and which could have been easily separated and still left his confession of his own guilt intelligible as such.

ARSON (7)—EVIDENCE—AIDING AND ABETTING OFFENSE—HIRING. In a prosecution of an aider and abettor in arson, charged with encouraging, advising, inducing . . . and procuring the commission of the offense, it is admissible to prove that the defendant made offers to "hire" or pay the principal, as tending to show attempts to induce the act; especially in view of Rem. Comp. Stat., § 2260, making it a felony for any person to "directly or indirectly" counsel, encourage, hire . . . or otherwise procure another to commit a felony; also, it is admissible to show "threats," which induced the principal to commit the offense, although the word "threat" is not used in the statute.

SAME (8)—EVIDENCE OF MOTIVE—ADMISSIBILITY. In a prosecution of an aider and abettor in arson, for the burning of hay on certain

[1]Reported in 225 Pac. 55.

lands, it is admissible, in order to show motive, to introduce the record in a contest over water rights on the land decided adversely to the accused.

Appeal from a judgment of the superior court for Okanogan county, Neal, J., entered April 30, 1923, upon a trial and conviction of arson. Reversed.

*W. C. Gresham* (*G. V. Alexander*, of counsel), for appellant.

*P. D. Smith*, for respondent.

Parker, J.—The defendant, Lyda, was, by information filed in the superior court for Okanogan county, charged with the commission in that county of the offense of arson in the second degree, in that he "did then and there wilfully, unlawfully, and feloniously, encourage, advise, induce, aid, assist, abet, and procure one Willard Sawyer, to set fire to and burn a certain quantity of hay, the property of one Mason Thurlow, said hay being then and there cut and stacked, and that by reason thereof, said Willard Sawyer, on or about the 29th day of October, 1922, in Okanogan county, state of Washington, did then and there unlawfully set fire to and burn a certain quantity of hay, the property of Mason Thurlow, as aforesaid." The trial of the case in that court, sitting with a jury, resulted in a verdict of guilty and a judgment rendered thereon accordingly against the defendant, from which he has appealed to this court.

It is contended in behalf of appellant that the trial court erroneously ruled to his prejudice in permitting the state's witness Johnson to testify, in response to questions propounded by special prosecuting attorney Smith, to a confession of Willard Sawyer that he was guilty of the burning of the hay in question and the one who actually did such burning; counsel

for appellant especially objecting to Johnson's testifying to Sawyer's statements in connection with his confession, in so far as they implicated appellant in the crime as an aider and abettor.

The testimony of Johnson to the confession made by Sawyer as to what was done by him in the commission of the offense as charged in the information was relevant and admissible. Counsel for appellant invoke the general rule that declarations of co-conspirators made after the conspiracy has ceased, by consummation or otherwise, are but narrations of past events and are admissible only against those who make them. That rule is of no controlling force in our present inquiry. This is not a criminal conspiracy charge, but is a charge of the commission of a consummated act, to wit, the actual burning of the hay by Sawyer and the aiding and abetting him in so doing by appellant, thus making appellant also a principal in the crime under the laws of this state. Rem. Comp. Stat., § 2260 [P. C. § 8695]. The charge against appellant was but a charge of his having committed the crime as principal by different means than those employed by Sawyer. In *State v. Mann,* 39 Wash. 144, 81 Pac. 561, there was presented the question of the confession of one charged with arson being admissible as against another who was charged with aiding and abetting in the commission of the same arson. It was there said:

"In order to convict the appellant it was necessary for the state to prove the crime as alleged; that is to say, it must show, first, that Nettie Mann committed the crime of arson; and second, that the appellant aided and abetted her therein. The state, in order to prove the first of the requisites, could resort to any evidence which would have been admissible had Nettie Mann herself been upon trial. This would include her confessions and admissions, as well as any other competent evidence tending to prove the crime as laid."

Our problem here, however, is something more than
the mere question of confession of guilt by the princi-
pal as proof of the commission of the offense by him,
preliminary to the proof of another being also guilty
of the offense by means of being an aider and abettor
therein. It becomes necessary to examine with great
care the testimony given by Johnson touching Saw-
yer's confession, and note to what extent his testimony
in that behalf connecting appellant with the offense
became necessary, if at all, to render Johnson's testi-
mony of Sawyer's confession intelligible, to the end
that, in so far as it relates to what appellant did in the
way of aiding and abetting Sawyer in the commission
of the offense, we may determine whether or not it
was anything more than mere hearsay as against ap-
pellant. We approach this problem fully appreciating
the general rule that, when evidence is pertinent and
of probative force touching an issue in a case, as the
commission of the arson by Sawyer was an issue in
this case, such evidence is not to be excluded merely
because it may also tend to prove, or create a belief or
suspicion of, some fact prejudicial to a party to the
case, as to which fact it would not be admissible. In
such a situation, the party whose rights may be
prejudiced by such evidence is, of course, entitled to
have it limited to the very issue to which it is relevant
and competent, and have it wholly excluded from con-
sideration with reference to any other issue in the case
to which it is not relevant and competent. It is con-
ceivable that Sawyer's confession might have been
such that Johnson, hearing it, would have been unable
to make it intelligible by eliminating from Sawyer's
statements in connection with his confession all refer-
ence to appellant, as seems to have been the nature of
the confession involved in *State v. Mann, supra.* We

think, however, such was not the nature of Sawyer's confession and statements in connection therewith here involved, as testified to by Johnson in response to questions put to him by the special prosecutor, Mr. Smith, as follows:

"Q. Mr. Johnson, shortly after this hay was burned over in the Methow last October, did you go over there with the sheriff? A. Yes, sir. Q. And did you bring Mr. Sawyer back here with you—that is, Willard Sawyer? A. Yes, we did. Q. After you got back here with him, did you have any conversation with him about the burning of that hay? A. We did, yes. Q. And where did that conversation occur? A. That was in the office of the commissioners, down on the lower floor there. Q. And about when was it with reference to the fire? A. Let's see. I think we brought him back here on Sunday following the fire, and this conversation occurred about two days after that, I think, within a few days, I can't say. Q. I wish you would tell the jury the whole conversation, what he said to you in regard to it. A. Mr. Mc-Cauley, I think, was present, and Mr. Hatcher, assistant in the treasurer's office. We went to the commissioner's office, and I said to Willard: 'We brought you up here so that if you want to talk to me now about this burning you can do it,' and I think almost immediately he said, 'I do want to talk to you about it,' and the tears came to his eyes and he was quite broken up apparently about it, and I said, 'All right, Willard, go ahead and if you want to talk, tell me all about it,' and he first said that he hadn't told me anything about it before because he didn't dare, . . . I said to him, 'Willard, you burned this hay, didn't you?' and he said, 'Yes, I did.' And I asked him if he was the only one that had anything to do with it and whether someone else was mixed up with it, and I said, 'If you are not solely responsible for it there is no reason why you should be the only one to suffer for it. If there is someone else mixed up with it he should share the punishment.' And he said there was, and I

asked him who, and he said Mr. Lyda, and I then asked
him to tell me exactly what he had done and what Mr.
Lyda had done, and then he proceeded to tell me about
it. . . . The substance of it, as I recall it, was this:
that he had been living at Ohme's place (isn't it—Ed.
Ohme's?) for I forget how long prior to the time of
the fire and had been sleeping in a little building on the
Ohme's place which was occupied by himself and Mr.
Lyda, and he said that at that time Mr. Lyda was fore-
man on some ditch work and he (Willard) was working
for Mr. Lyda and that sometime before this fire—I
can't tell you how long he said it was—the matter of
burning this hay was first mentioned to him, and that
Mr. Lyda, in a conversation which they had, suggested
to him the burning of the hay, and I think made him
some proposition that he would be given some horses
or something of that kind if he would do it, and that
Willard told him that he didn't want to do it at first.
In substance, that Mr. Lyda then threatened him . .
. he said he told him he would put him out of the way
unless he burned this hay. And that he said in sub-
stance that he finally agreed that he would do this.
Then I asked him to tell me just what the arrangement
was and what Mr. Lyda told him to do and whether he
did it. I think he first told me what he did. He said
that he went up to the Miller place first, following a
trail up the canyon. . . . I first asked him just
what he did and how he did it. He said he went up to
the Miller place, following a trail up a canyon above
the county and state road, a trail that we had gone
over when we were there. I called his attention to it,
and he first started, or made his arrangements to burn
the hay at the Miller place. . . . That he took a
candle and placed it underneath the stack of hay on the
side, first digging the hay out a little so as to make a
little place for it, and then built up a little barrier of
hay and leaves, etc., to protect the candle from the
flame, and then lit the candle and left it and went down
to the Thurlow place. I asked him why he burned the
particular stack that he did at Miller's and if he had
been told to burn any others. He said that Mr. Lyda

had told him to burn the hay at the barn on the Miller place—apparently, he wanted the barn burned—but that he lost his nerve and didn't go to the stack at the barn, and after setting the candle at the hay stack on the Miller place he went to the stack on the Thurlow place which is nearest the Thurlow house and set a candle there in the same way, and from there went to the third stack on the hill below the Thurlow house and down toward the road and set a candle there in the same way, and then went back to the shack where he had been sleeping. 'Now,' I said, 'how did you happen to do it in this way? Did Mr. Lyda tell you how to do it?' He said he did, that Mr. Lyda told him how to set the candles and how to protect them, and I think I asked him where he got the candles and what kind of candles they were. I think he told me that he got the candles from Mr. Lyda.''

We have omitted the numerous objections and exceptions interspersed in this quoted testimony of Johnson. It is sufficient for present purposes to say that such objections and exceptions are sufficient to entitle appellant to a review of his claim of error in the admission of this testimony of Johnson, in so far as it relates the statements of Sawyer in connection with his confession touching appellant's aiding and abetting him in the commission of the offense. This testimony of Johnson renders it plain, we think, that it would have been an easy matter for him to have rendered Sawyer's confession of his own guilt of the offense fully intelligible as such, without making any reference whatever to appellant's connection with the offense as an aider and abettor. What Sawyer said to Johnson with reference to appellant as an aider and abettor in the crime was the purest hearsay as against the appellant, and to us seems to have been wholly unnecessary to render Sawyer's confession of his having committed the offense fully intelligible. It added nothing to the

weight of Sawyer's confession of guilt, which was the only question with reference to which Sawyer's statements to Johnson were in the least relevant or competent. As to all else it was pure hearsay. We note that, after the introduction of this testimony by Johnson, the prosecution introduced the record of Sawyer's plea of guilty of this same offense in the same court prior to the trial of this case against appellant; this, of course, as additional proof that Sawyer had committed the offense, preliminary to showing that appellant aided and abetted therein. We also note that Sawyer was present as a witness at the trial of this case and personally testified in full harmony with Johnson's version of his (Sawyer's) confession, telling not only all that he had told Johnson in his confession, but as to details considerable more. Of course, his testimony as to what appellant did in aiding and abetting him in the commission of the offense was relevant and not hearsay. All of this but emphasizes the entire want of any necessity or excuse of having Johnson testify to facts stated by Sawyer to him with reference to appellant's connection with the offense as an aider and abettor. Sawyer's story of what appellant said and did in aiding him and inducing him to burn the hay was thus put before the jury twice; once by Sawyer's statement testified to by Johnson, manifestly hearsay, and second by Sawyer's own testimony. This, to our minds, was wholly unjustifiable and in violation of one of the most elementary rules of evidence, and prejudicial as against appellant in the very highest degree. Because of this error appellant is entitled to a new trial.

The trial court permitted Sawyer to testify, over the objection of counsel for appellant, in part as follows:

"Q. Now, Mr. Sawyer, is it a fact that you, during

the latter part of last October, set fire to some hay belonging to Dr. Miller and Mason Thurlow one night? A. Yes, sir. Q. Mr. Sawyer, I want you to proceed now and tell the jury in your own way just exactly how you came to do that, what you did and how you burned it and all about it. A. Well, Mr. Lyda, he offered me first four head of horses to burn this hay. Q. Burn what hay? A. Dr. Miller's and Mr. Thurlow's. Q. What did you tell him? A. I told him no, I didn't want his horses and I didn't want to burn the hay. Then after he found out I wouldn't take the horses and go ahead and burn the hay, that is when he threatened me. Q. Just tell what he said to you. A. He said, 'I will put you out of the way if you don't burn it.' Q. When did he tell you that with reference to when you did burn the hay? A. That was on—about noon on Friday. Q. About how many times did he tell you he would put you out of the way if you didn't burn it? A. Three times. Q. And then what did you finally tell him? A. I told him I would do it. Q. When was it you told him you would burn it? A. It was Friday at noon. Q. That was the Friday before the Saturday night that you did burn it? A. Yes.''

The admission of this testimony is claimed as erroneous and prejudicial to appellant because the information does not charge appellant with ''hiring'' or ''threatening'' Sawyer as a means of inducing him to burn the hay, the words of the information being ''encourage, advise, induce, aid, assist, abet and procure.'' Our statute defining principals in crime and in effect abolishing the distinction between principals and accessories before the fact (§ 2260, Rem. Comp. Stat.) [P. C. § 8695], reads:

''Every person concerned in the commission of a felony, gross misdemeanor or misdemeanor, whether he directly commits the act constituting the offense, or aids or abets in its commission, and whether present or absent; and every person who *directly* or *indirectly counsels, encourages, hires, commands, induces* or

*otherwise procures* another to commit a felony, gross misdemeanor or misdemeanor, is a principal, and shall be proceeded against and punished as such.''

We have italicized the words to be particularly noticed.

The words ''directly or indirectly'' strongly suggest that the words following, which we have italicized, are used largely in a synonymous sense. If, however, the word ''hire'' ought not to be so considered as synonymous with the others, and the offer by appellant to Sawyer of four head of horses to burn the hay be considered as an offer of hiring, it amounted to nothing more than an offer that was not accepted and was not the inducing cause of Sawyer's burning the hay. It was manifestly not relied upon by counsel for the state as constituting the offense. But that, it seems plain to us, does not argue that evidence of the offer, in connection with all of the circumstances occurring at about the time it was made, was not relevant to the issues involved. It manifestly did tend to show that appellant was attempting to induce Sawyer to burn the hay, which was followed by other inducements which became effectual to that end. We think the court did not commit error in allowing Sawyer to testify as to appellant's thus attempting to hire him to burn the hay.

As to the threats testified to by Sawyer as being made by appellant to induce him to burn the hay, we think such testimony was admissible. The word ''threat'' is not found in the statute or information; but, to our minds, evidence of threats by appellant such as Sawyer testified to have been made by appellant were clearly admissible to show inducement put forth by appellant to have Sawyer burn the hay.

It is contended in behalf of appellant that the trial

court erred to his prejudice in receiving in evidence a portion of the record of a case theretofore tried in the superior court for Okanogan county involving a contest over water rights, wherein appellant's claimed rights were in serious conflict with the claimed rights of Mason Thurlow, Dr. Miller and others; and wherein Thurlow, Miller and others were awarded water rights superior to those claimed by appellant and over his protest. This contest, as the record so introduced shows, involved claimed water rights of Thurlow and Dr. Miller to the lands on which the hay was burned by Sawyer, as testified to by him, and on which that hay was raised. The trial judge, by his instructions, plainly gave the jury to understand that this record of that controversy must be considered by them only as bearing upon the question of appellant's motive, and without reference to the real rights of any party to that controversy. So limited by the court's instructions, we think the record was admissible in evidence.

Some other contentions are made in appellant's behalf touching certain rulings of the trial court made in the case. We think, however, in so far as such rulings may have possibly been erroneous, they are not likely to be repeated upon a new trial, and we therefore deem it unnecessary to further notice such claims of error here.

The judgment is reversed, and the cause remanded to the superior court with directions to award appellant a new trial, or for such further proceedings as may not be inconsistent with the views herein expressed.

MAIN, C. J., HOLCOMB, TOLMAN, and MACKINTOSH, JJ., concur.