[No. 32428.   Department Two.   December 4, 1953.]

THE STATE OF WASHINGTON, *Respondent*, v. WILLIAM
BARRY, *Appellant.*[1]

[1]Reported in 264 P. (2d) 233.

*Geo. H. Crandell,* for appellant.

*Charles O. Carroll, Frank Harrington,* and *Leo F. Richter,* for respondent.

DONWORTH, J.—Defendant William Barry was charged with aiding and abetting one Byrne in the commission of grand larceny by means of fraudulent representations, and by trick, device, and bunco, and with knowingly receiving and concealing a part of the money wrongfully appropriated. He has appealed from the judgment and sentence entered upon the jury's verdict of guilty.

The bunco game was a well planned and skillfully executed scheme which was carried out by three persons: Fisco, Siegel, and Byrne (hereafter referred to as the "bunco team"). Fisco contacted the victim and induced him to engage in a morals offense. By prearrangement with Fisco, Siegel and Byrne appeared on the scene. They produced false credentials, identified themselves as police officers, and "arrested" the two men. The victim was induced to believe that Siegel and Byrne might be able to arrange to indefinitely postpone his prosecution, with the attendant publicity, if he would put up "bail." Ultimately the victim gave them twenty thousand dollars as "bail," which one of the bunco team later told him had been "forfeited."

Fisco was charged with aiding and abetting Byrne but was not tried with him. Appellant and Byrne were tried jointly. Fisco and Siegel both testified against them. Shortly before the state rested its case, Byrne withdrew his plea of not guilty and entered a plea of guilty. He did not testify at the trial.

No evidence was offered to show that Byrne had not committed grand larceny as charged, and appellant does not contend that the evidence was insufficient to prove the commission of the crime charged against Byrne in the information.

Appellant complains that he was unfairly tried and convicted of aiding and abetting Byrne in the commission of that crime because: (1) the court erred in denying appellant a fair and impartial trial; (2) in the examination of the state's principal witness (Siegel), the deputy prosecuting attorney was guilty of misconduct; (3) the court erred in refusing to grant appellant a mistrial; (4) the court erred in admitting exhibit No. 3, to-wit: seven $500 bills which were not properly identified and the source of which was not proven; and (5) the court erred in admitting exhibit No. 6, a police badge.

Before discussing these assignments of error, we will refer to the evidence only to the extent that it bears upon appellant's alleged connection with the crime committed by Byrne.

Siegel testified that he had known appellant for twenty years, and that he was in Los Angeles in July, 1952, when he telephoned appellant at the Turf Smoke Shop in Seattle and inquired about conditions in the locality. Byrne was with Siegel in Los Angeles and also participated in the conversation. Appellant told Siegel to come to Seattle and bring Byrne with him. Accordingly, they came to Seattle a few days later, and Siegel talked with appellant several times about possible buncos.

After their victim had been selected and the "arrest" made on September 13, 1952, Siegel and Byrne agreed to "release" him after he furnished them with certain references and personal information. Shortly thereafter he was transferred by his employer to New Westminster, B. C.

The evidence tends to show that on September 27, 1952, the bunco team together with appellant drove to Vancouver, B. C., and on the way back through New Westminster stopped to determine whether the victim still suspected nothing and, if so, to induce him to return to Seattle. Siegel

and Byrne left the car and interviewed the victim in his place of employment. Fisco testified that appellant also left the car and watched the victim through a window in order to be able to recognize him and trail him when he returned to Seattle.

Appellant took the stand in his own defense. He admitted accompanying the other three men on the trip and stopping at New Westminster. He denied that the victim's name was mentioned during the trip, that he ever had any knowledge of the fraudulent scheme, or that he got out of the car in New Westminster. He testified that he accompanied the others on the trip with the intention of purchasing an overcoat in Vancouver.

Siegel testified that on September 29, 1952, he and Byrne drove the victim to Everett while he removed certain government bonds from his safe deposit box for the purpose of furnishing "bail." After their return to Seattle, Siegel telephoned appellant for advice as to whether such bonds would be acceptable. Appellant told him that it took too long to arrange a sale of registered bonds and advised having the victim get his bearer bonds and sell them. The four men wished to procure the cash as soon as possible.

According to Siegel, he referred to appellant as "captain" during this telephone call. He informed the victim that he was talking to a police captain and then put the victim on the line so that he could thank the captain for his help. Appellant denied that such a phone call was ever made to him.

The victim procured his bearer bonds from his safe deposit box in Everett and was driven by Siegel and Byrne to a Seattle bank, where he pledged them for a loan of twenty thousand dollars. Siegel testified that appellant watched the victim while he obtained the money. The victim took the money he had secured from the bank and gave it to Siegel, who was waiting outside the bank with Byrne. They retired to Siegel's hotel room and called appellant, who came there immediately. Siegel testified that they then paid appellant ten per cent of the proceeds of the scheme, to wit, two thousand dollars, plus an extra five hun-

dred dollars for trailing the victim after he arrived back in Seattle, plus another five hundred dollars which Siegel owed to appellant.

Appellant admitted meeting the men in Siegel's hotel room but said that Siegel paid him only the five hundred dollars which appellant had loaned him several years before. He denied receiving any other money.

The first three assignments of error will be considered together. Appellant claims misconduct on the part of the deputy prosecutor in the examination of the witness Siegel. He quotes in his brief the following statements made by Siegel in answer to questions put to him regarding his relations with appellant:

"A. Well, it was pertaining to a shakedown. . . . A. Mr. Barry knew what business I had been in for twenty years. . . . A. I said I've been a thief all my life. . . . A. I've been involved in the shakedown and bunco rackets. . . . A. Well, I asked Mr. Barry what the nature of the business was that he had for me to start with, and he told me it was pertaining to a shakedown. . . . A. It was a shakedown of a doctor."

After each of these six statements by the witness, appellant's counsel moved to have the answers stricken from the record. All but two motions were granted. The court allowed the third and fourth answers to stay in the record, as they were responsive to questions concerning the witness' occupation. We cannot say that the trial court erred in making these rulings.

Following the granting of the last motion to strike, appellant's counsel moved for a mistrial, saying:

"MR. CRANDELL: May I now at this time move for a mistrial. The error has been piled up to such an extent that I doubt if an instruction can cure the damage that has been done.

"THE COURT: Your motion for a mistrial is denied. The jury will be instructed to disregard the remarks of Counsel regarding error piling up. Go ahead.

"MR. CRANDELL: May I ask the Court to make this one observation also, that so far as possible they should eliminate from their minds the statement and the statements as you strike them? For some of this jury it's the first time

that they have served, and the mere striking of it and the Court granting it may not convey to them just what that means. That's why I am urging it, Your Honor.

"THE COURT: Very well. Members of the jury, whenever any part of a statement by a witness is stricken or a statement by Counsel is stricken, it merely means that the Court has decided that it is not properly before the jury. As to those remarks, they will be disregarded by the jury. Anything that is stricken, of course, will be disregarded. You may proceed.

"MR. CRANDELL: Thank you very much, Your Honor."

■ Appellant argues that the situation created by the deputy prosecutor and the witness was so prejudicial that no instruction of the court could cure the effect of the alleged misconduct and the court erred in refusing to grant a mistrial. The cases of *State v. Bozovich,* 145 Wash. 227, 259 Pac. 395; *State v. Heaton,* 149 Wash. 452, 271 Pac. 89; and *State v. Tweedy,* 165 Wash. 281, 5 P. (2d) 335, are said to support appellant's contention.

Without discussing these decisions in detail, we have examined them and find that in the present case there is no such flagrant misconduct of the prosecutor or the witness as existed in the cited cases. Here the witness' answers which were stricken upon appellant's motions were not of such a nature that the jury was unable to obey the court's prompt instruction to disregard them.

We cannot find that the trial court committed any reversible error in respect to the matters upon which appellant has based his first three assignments of error.

Appellant next contends that the trial court erred in admitting in evidence exhibit No. 3 (consisting of seven $500 bills) because there was no evidence that this was the identical money paid by the victim to Siegel and Byrne.

As authority for his argument, appellant relies on *State v. Mason,* 41 Wn. (2d) 746, 252 P. (2d) 298. That case involved two separate crimes: (1) grand larceny by bunco committed in King county and (2) bringing into King county certain Canadian currency knowing that it had been obtained by bunco practiced in British Columbia. This court affirmed the conviction on the first charge but re-

versed as to the second, holding that the mere showing of possession of unidentified United States currency without proof of its source was insufficient to prove the crime charged. That decision is clearly not controlling in the present case, which involves no question of transporting stolen money.

The seven $500 bills in question were discovered by the police on October 27, 1952, when they searched Byrne's safe deposit box pursuant to a search warrant. The key to the box had been found two days earlier as a result of a search made incident to Byrne's arrest.

■█ While it is true that the bills in question were not positively identified as those taken from the victim, this fact does not necessarily render them inadmissible.

"The mere possession of a quantity of *money* is in itself no indication that the possessor was the taker of money charged as taken, because in general all money of the same denomination and material is alike, and the hypothesis that the money found is the same as the money taken is too forced and extraordinary to be receivable. *But where the denominations of the money found and the money taken correspond in a fairly close way, the fact of the finding of that specific money would have probative value and be relevant, because the money found is fairly marked as identical with the money taken.*" (Italics ours.) 1 Wigmore on Evidence (3d ed.) 601, § 154.

For cases holding that proof of possession of money soon after the commission of a crime is admissible where the money is of the same denomination as that taken, see *State v. Huff,* 56 Idaho 652, 57 P. (2d) 1080; *People v. Filipak,* 322 Ill. 546, 153 N. E. 673; *Haney v. State,* 199 Miss. 568, 24 So. (2d) 778 and *State v. Crowder,* 114 Utah 202, 197 P. (2d) 917.

The bank teller testified that he gave the victim twenty thousand dollars in $1,000 and $500 bills at the time the bonds were pledged. The victim testified that he then gave this money to Siegel in the presence of Byrne. The fact that Byrne was found to be secreting seven $500 bills within thirty days after the victim had paid twenty thousand dollars in currency of similar large denominations was

a material fact for the jury to consider in connection with the other evidence presented. See *State v. Burns,* 19 Wash. 52, 52 Pac. 316.

Byrne was charged by information with the crime of obtaining money unlawfully by means of fraudulent representations and by trick, device and bunco. Appellant was charged with aiding and abetting him. In order to convict appellant, it was necessary for the state to prove, first, that the crime charged had actually been committed and, second, that appellant aided and abetted in its commission. *State v. Klein,* 94 Wash. 212, 162 Pac. 52; *State v. Nikolich,* 137 Wash. 62, 241 Pac. 664. Evidence which would be admissible against the principal if tried alone may be admitted in evidence on the trial of the aider and abettor in order to prove that the principal crime was committed. *State v. Anderson,* 165 Wash. 437, 5 P. (2d) 994; *State v. Bixby,* 27 Wn. (2d) 144, 177 P. (2d) 689.

This court has recognized one limitation to this rule. Where two or more defendants are being tried jointly a confession made by one of them, made out of the presence of the others, may be admitted in evidence but the jury should be instructed not to consider it as evidence against any defendant who was not present when it was made. *State v. Goodwin,* 29 Wn. (2d) 276, 186 P. (2d) 935. As indicated in *State v. Lyda,* 129 Wash. 298, 225 Pac. 55 and *State v. Crossman,* 189 Wash. 124, 63 P. (2d) 934, the reason that the confession made out of the presence of a codefendant may be considered only as against the defendant who made it is that whatever was said therein concerning his codefendant's actions or statements would be pure hearsay.

Here no confession by Byrne was involved. The evidence objected to by appellant was relevant to one of the issues of the case, to wit, whether or not the principal crime had been committed, and was not violative of the hearsay rule. The seven $500 bills were properly admitted and the question of their probative value was for the jury to decide. *State v. Cofer,* 73 Idaho 181, 249 P. (2d) 197.

Finally appellant argues that the failure of the trial court to withdraw exhibit No. 6 after Byrne pleaded guilty con-

stituted prejudicial error. The exhibit consisted of a policeman's badge which Byrne had used to falsely represent himself as a police officer at the time of the victim's "arrest."

We believe that what has previously been said concerning the currency sufficiently answers this contention. However, since no request to withdraw this exhibit was ever made to the trial court at any time, appellant may not now for the first time be heard to say that the failure to do so constituted prejudicial error.

From our examination of the entire record, we find that no prejudicial error was committed. No exceptions were taken to any of the court's instructions to the jury. After hearing all the evidence, the jury chose to believe the state's witnesses and to disbelieve appellant's testimony. There was ample evidence to support the verdict of guilty.

Appellant had a fair trial, and the judgment and sentence must be, and hereby is, affirmed.

GRADY, C. J., SCHWELLENBACH, HAMLEY, and FINLEY, JJ., concur.