189 N.J. Super. 273 (1983)
460 A.2d 120
STATE OF NEW JERSEY, PLAINTIFF-RESPONDENT,
v.
PETER J. CORUZZI, DEFENDANT-APPELLANT.
Superior Court of New Jersey, Appellate Division.
Argued January 25, 1983.
Decided March 24, 1983.
*280 Before Judges MATTHEWS, ANTELL and FRANCIS.
William Welaj, designated counsel, argued the cause for appellant (Joseph H. Rodriguez, Public Defender of New Jersey, attorney).
Pursuant to leave granted, defendant filed a pro se brief.
Audrey G. Cohen, Deputy Attorney General, argued the cause for respondent (Irwin I. Kimmelman, Attorney General of New Jersey, attorney).
The opinion of the court was delivered by MATTHEWS, P.J.A.D.
State Grand Jury Indictment 86-81-5 charged Peter J. Coruzzi, a judge of the Superior Court of this State, with: count I, conspiracy to commit official misconduct and bribery, in violation of N.J.S.A. 2C:30-2 and 2C:27-2; count II, official misconduct, in violation of N.J.S.A. 2C:30-2, and counts III, IV, V and VI, bribery, in violation of N.J.S.A. 2C:27-2. Trial was held before Judge Scalera and a jury from March 8 through 25, 1982, at the conclusion of which Coruzzi was found guilty as charged. On May 7, 1982 Judge Scalera imposed concurrent five-year terms on counts III, IV, V and VI, imposed a fine of $2,500 and ordered restitution of $3,000 to the State of New Jersey. Judge Scalera merged counts I and II with the bribery counts.
*281 The statement of facts which follows is drawn largely from the statement of facts in defendant's brief on appeal since that statement was concurred in by the State and adopted in its brief. Our reading of the trial record satisfies us that defendant has set forth a fair and accurate account of the facts established by the proofs at trial.

I

The State's Case
The State's case relied to a substantial degree upon the cooperation and testimony of an attorney, Louis Caggiano, who was subsequently disbarred for his participation in the wrongdoings for which defendant was indicted. In return for Caggiano's cooperation during grand jury and trial proceedings, the State gave Caggiano complete immunity from any potential charges arising out of the events to which he testified. Caggiano's testimony combined with the testimony of various other State's witnesses linked defendant with three specific criminal matters, and were referred to as the Bocelli incident, the Morselli incident and the Gambell incident.
Caggiano had been an attorney for 33 years and had known defendant as an attorney and a judge for 25 years. Both Caggiano and defendant had centered their practices in the Camden County area.

The Bocelli Incident
Eugene Bocelli had been indicted in December 1979 for aggravated assault in Camden County. He was represented by Hersh Koslov, a member of the bar. A plea arrangement was eventually worked out among Bocelli, Koslov and Assistant Camden County Prosecutor Yaron Helmer. Defendant accepted Bocelli's guilty plea and sentenced him in early January 1981 to a five-year jail term. Koslov filed a motion for reconsideration immediately thereafter which was denied by defendant several weeks later. Although Helmer took no position at the sentencing, *282 he opposed the motion for reconsideration, arguing that the sentence had been lenient since a presumptive sentence of seven years existed.
Caggiano first heard of the Bocelli matter in mid-March 1981 in defendant's chambers when defendant asked him if he knew Bocelli, noting that Bocelli had worked at the Vesco Auto Body Shop. Defendant added he had sentenced Bocelli but that upon a reconsideration of sentence Bocelli could receive a suspended sentence and be released from jail "for a price." Defendant told Caggiano that if "you're not willing, let's just forget the entire conversation." Caggiano indicated he would get back to defendant.
Approximately a week later Caggiano told defendant in his chambers that he had not yet contacted Bocelli. Defendant, as he thumbed through what appeared to be a presentence report, indicated that Bocelli should be able to pay $20,000 since he had income-producing property and money in the bank. Caggiano said that he would see what he could do.
During March 1981 Caggiano called the Vesco Auto Body Shop and spoke with one of the Vescos with respect to helping Eugene Bocelli. Arrangements were made for Caggiano and Bocelli's brother Philip to meet in a nearby diner. At that meeting Caggiano told Philip Bocelli that a legal loophole existed which could be used to release his brother from jail, but that it would cost $20,000. Philip stated that he did not have that kind of money but would speak to his brother. Caggiano did not identify himself as an attorney at that time. The day following the meeting, Caggiano informed defendant in his chambers as to his discussion with Bocelli.
Caggiano subsequently contacted Philip Bocelli who informed him that his brother had not been receptive to the idea because the amount of money was too much. Caggiano consequently informed defendant, who noted that the Bocellis should have sufficient money and that Caggiano had to do something. Defendant added that he had received recent correspondence indicating *283 that Bocelli's family was suffering emotionally and physically as a result of his incarceration. Caggiano asked defendant if he should see what he could do, and defendant indicated he would. Defendant informed Caggiano that there had been one motion for reconsideration made and that they were running out of the 60-day time limitation for another motion. He said that if something was going to be done, it had to be done quickly, but that Caggiano should not mention his name and should leave him out of any discussions.
In the early part of May, Philip Bocelli received a phone call from Caggiano and the two met at a nearby diner. Caggiano indicated that something had come up which had to be moved on immediately, adding that he could get his brother out of jail for $10,000. The price appeared to be agreeable to Philip who indicated he would have to discuss the matter with his brother. Caggiano gave Philip his business card, indicating that if he trusted an attorney, he should go to that office to see that attorney. At that point Philip as yet did not know Caggiano's identity as a member of the bar.
Philip immediately drove to Caggiano's office in Maple Shade where he expressed surprise at seeing Caggiano since he had not known with whom he had been dealing. Caggiano repeated his earlier comments but would not tell Philip the manner in which the release from prison would be accomplished. He further emphasized the need for immediacy of any action. Philip agreed to meet with his brother who, when informed of the situation, agreed that he wanted to get out of jail.
Caggiano saw defendant in his chambers the next day and informed him of his meeting with Philip Bocelli. Defendant seemed agreeable to the proposal. Caggiano subsequently called Philip Bocelli to tell him that time was of the essence, and they agreed to meet at Caggiano's office on May 20, 1981. At that meeting Philip Bocelli gave Caggiano an envelope containing $10,000. Caggiano told Philip that either he or his brother *284 would be hearing from Koslov, and that Koslov should be permitted to take all the credit.[1]
Caggiano immediately called defendant and told him of his meeting with Bocelli. They met later that day in a parking lot at a restaurant where Caggiano gave $7,000 to defendant. Caggiano had unilaterally made the determination as to how much to keep; there had been no prior discussions between defendant and him with respect to the division of monies.
During May 1981 Assistant Prosecutor Helmer had occasion to be in defendant's chambers on various occasions. In each instance defendant asked Helmer if he had made the right decision in the Bocelli case, suggesting that the sentence might possibly have been too harsh. He emphasized the correspondence he had received describing the hardship to the Bocelli family, and that he had contacted the head of the parole board, who informed him that Bocelli was a model prisoner. Defendant further compared this custodial sentence with a similar case in which a six-month period of incarceration had been recommended by the State. Helmer indicated that there had been distinguishing factors between the two cases but defendant nevertheless appeared bothered by the sentence.
In mid-May 1981 defendant called Helmer into chambers and asked him to do a favor since he felt badly about the Bocelli family. He believed Bocelli had suffered enough and asked Helmer not to oppose a motion for reconsideration. He further asked Helmer to call Koslov and request that he file such a motion. Helmer subsequently contacted Koslov and informed him that Coruzzi would look favorably upon a motion for reconsideration if it was filed. Because the incident was so unusual, Koslov prepared a memo summarizing this meeting. Koslov subsequently filed a motion for reconsideration returnable May 29, 1981. Helmer did not appear at the motion but the assistant *285 prosecutor who did was instructed by Helmer not to object. Upon the return date of the motion, defendant granted the relief sought and released Bocelli from incarceration.

The Gambell Incident
William Keyser had been indicted for the theft of $33,500 which had been found in the trunk of his car upon his arrest and subsequently confiscated by the county. Keyser was represented by Robert Gambell who conducted various pretrial proceedings before reaching a plea arrangement with the prosecutor's office. Keyser, however, was unable to establish a factual basis for his plea. Gambell then advised Keyser to get another attorney who was experienced in criminal trials. Gambell was subsequently replaced by Koslov by a substitution of attorney being filed September 29, 1981.
During a conversation in defendant's chambers, defendant mentioned the names of Gambell and Keyser to Caggiano. He asked Caggiano if he knew Gambell, noting that Keyser, his client, when apprehended, had had $33,000 in cash in his car. Caggiano was requested by defendant to see what arrangements he could make regarding the matter, with the precaution that he was to leave defendant's name out of any discussions.
During the latter part of October 1981, after meeting with defendant, Caggiano attempted to contact Gambell. He eventually spoke to him by phone on October 30, 1981, and met with him later that same day. Caggiano told Gambell that his client could be helped but that it would be very expensive, around $50,000, which would include Gambell's fee. Gambell told Caggiano that he did not want anything in that regard, adding that he no longer represented Keyser and that Koslov was now the attorney of record. However, since he represented Keyser in an unrelated civil matter and would see him the following Monday, Gambell said he would relay the information to him and get back to Caggiano. Caggiano noted that if that was the case, the amount of money necessary to insure a noncustodial sentence *286 would only be $35,000. Caggiano arrived at this figure based upon defendant's statement to him that he wanted $25,000 for his part in the matter.
On Monday, November 2, 1981, Gambell spoke by telephone to Keyser and mentioned that someone guaranteed a noncustodial sentence for $50,000. Keyser agreed with Gambell that nothing should be thought of it. The same day, Caggiano told defendant in chambers that he had met with Gambell but that he no longer represented Keyser. He repeated Gambell's comment that he would speak to Keyser and get back to Caggiano. Caggiano said he would ask for $35,000 and defendant replied, "good."
On Thursday, November 5, 1981, Gambell returned a phone call from defendant, in which defendant noted that the Keyser matter was the oldest case on his trial calendar and he wanted to move it. He asked Gambell if he could get the case back. Gambell said that he did not know but noted he would be seeing Keyser and would see what he could do. Defendant ended the conversation by saying "naturally, this conversation is confidential."

The Morselli Incident
Caggiano first heard about Sergio Morselli in July 1981 in defendant's chambers when defendant informed him that he had just concluded an interesting trial. Morselli and his wife had been indicted for arson and, although the wife had been acquitted, Morselli had been convicted by the jury. Morselli had been represented at trial by Robert Agre, an associate of Nathan Friedman's law firm. Agre subsequently became employed by the Division of Criminal Justice and Friedman thereafter handled the sentencing which was initially calendared for September 25, 1981. The assistant prosecutor in charge of the case asked for a postponement, however, and defendant assigned a new sentencing date of October 16, 1981. In chambers defendant informed Caggiano that it could be arranged for Morselli to receive a suspended sentence, and told him that whatever he did, to leave his name out of it.
*287 Caggiano indicated he would attempt to contact Morselli but was unable to do so until the latter part of September 1981. In early September he saw defendant on several occasions, and each time defendant wanted to know if he had made any progress with Morselli. Caggiano replied that he had not been able to contact the Morselli family. During their discussions defendant mentioned the sum of $20,000.
Caggiano was subsequently able to contact Morselli through a real estate broker. He and Morselli then met on October 15, 1981 at the Maple Shade Restaurant. During that meeting Caggiano informed Morselli that for $20,000 he would not have to go to jail. Caggiano added that if Morselli was interested, he should let him know, otherwise he should forget their discussion. Morselli described his problem of getting $20,000 since his sentencing was only two days away. Caggiano advised Morselli to ask his attorney to request an adjournment.
Caggiano saw defendant in chambers on October 16 and advised him of his meeting with Morselli, noting that Morselli appeared to be receptive to his proposal but that it would take more time to get the money. He added that he had advised Morselli to ask his attorney to request an adjournment.
Caggiano saw Morselli in the courthouse on the day of sentencing and they discussed the request for an adjournment. Caggiano reminded Morselli that if he was receptive for the proposal and wanted to do something, that he should have his attorney get an adjournment. Morselli stated that he would do so. Caggiano then went into defendant's chambers and discussed the fact that Morselli needed more time and that the matter had to be adjourned. Defendant indicated that was satisfactory to him.
Prior to sentencing, the assistant prosecutor spoke with Friedman, who informed him that he anticipated making a motion to postpone the sentencing. The assistant prosecutor said that he intended to oppose the motion. Friedman, however, withdrew his application to adjourn once the sentencing hearing began. *288 After the assistant prosecutor Friedman and Morselli spoke at sentencing, defendant stated he wanted additional time to consider alternatives and adjourned the sentencing until October 23, 1981. The assistant prosecutor noted previous commitments for that day, and defendant fixed the following Monday, October 26, 1981.
On October 20, 1981 Sergio Morselli attended a meeting with Deputy Attorney General Robert Agre and other law enforcement personnel. Morselli gave them information concerning Caggiano's discussions and, as a result thereof, investigative activities began. In the interim, Caggiano arranged with Morselli to meet on October 22, 1981 at the same restaurant as before. Morselli was fitted by the State Police with electronic surveillance equipment so that the conversation at the meeting could be monitored and recorded. Prior to the meeting Morselli was given $5,500 in cash by the State Police which was to be used as a down-payment by him to Caggiano.
During the meeting Morselli mentioned defendant's name but Caggiano attempted to convince Morselli that he was not part of the agreement, believing himself bound by defendant's warning that his name should not be mentioned in any discussions. Morselli indicated that he had $5,500 with him and transferred the money to Caggiano, who immediately put it into his pocket. Morselli then informed Caggiano that he needed from 10 to 14 days to obtain the remaining balance.
The following morning Caggiano gave $3,000 to defendant in his chambers. Caggiano added that they needed up to two weeks before Morselli could obtain the balance. Since the sentencing was scheduled for that Monday, October 26, defendant made the necessary telephone calls and postponed the proceedings to November 6, 1981.
On November 3 Caggiano called Morselli to arrange for a meeting on November 5, 1981. Caggiano informed defendant in chambers on the 5th that he would meet Morselli that evening. Defendant told him that if all went well, Caggiano should call *289 him at his home and they would later meet at a prearranged location.
Prior to the meeting Morselli was briefed by the representatives of the Division of Criminal Justice and was wired again so that his conversations with Caggiano could be monitored and recorded. Caggiano met with Morselli, who wanted assurances that everything would go well. Morselli told Caggiano he would meet him the following day at 1 p.m. since the sentencing was scheduled for 1:30 p.m. Although Morselli was supposed to have had the balance of the money that evening, he did not have it. Since Caggiano demanded that the balance be produced that evening, Morselli left for about one hour, during which he was given the $14,500 by the State Police. The money had been marked and tied in a distinctive bundle by the State Police. When Morselli returned with the $14,500, it was turned over to Caggiano.
Caggiano was subsequently taken into custody after he left the meeting with Morselli because the police concluded that he knew he was being followed when he attempted to evade them. He was stopped by two unmarked police vehicles. As he stopped his vehicle he dropped the packet of money outside the car which was immediately confiscated by the State Police. When taken to police barracks he was played a portion of the taped conversation between Morselli and himself. After hearing the tape Caggiano agreed to cooperate upon receiving an agreement of complete immunity from possible criminal charges.
Caggiano consented to a monitored telephone call to defendant's residence at approximately 7 a.m., on November 6. Arrangements were made for him, during that call, to pick defendant up at a garage and bring him to the courthouse complex. Caggiano was wired with electronic equipment so that the conversation in the car could be monitored and recorded. $12,000 of the $14,500 was given to Caggiano for his meeting with defendant.
*290 Caggiano drove to a nearby automobile dealership, knowing that he was being followed by unmarked police vehicles. As he pulled into the lot, defendant was standing with his jacket folded over his arm. During the ride to the courthouse Caggiano removed the $12,000 and placed it on the seat between himself and defendant. Defendant took the money and put it into the fold of his coat which was still folded on his lap. Caggiano indicated that he had given defendant $12,000, had previously given him $3,000 and that he had received a total of $20,000 from Morselli.[2] Just before defendant left the car in front of the courthouse, he placed the money inside the breast pocket of his jacket.
Several members of the State Police were detailed to the Camden County Courthouse complex that morning to effectuate the arrest of defendant if necessary. After defendant left Caggiano's vehicle, a prearranged signal was given by officers who had monitored the conversation inside the car. This signal prompted the plain-clothed troopers to arrest defendant. As the officers approached him they observed a large quantity of currency inside the right breast pocket of defendant's jacket. After identifying themselves the officers asked defendant to accompany them to an unmarked patrol car nearby. He was advised that he was under arrest and would be frisked for any *291 weapons. While the frisk was conducted defendant turned to an officer and asked that he be given a break and whether something could be done. During the pat-down search the trooper felt the packet of money inside the defendant's coat but did not remove it.
Once inside the vehicle defendant was advised of his rights and taken to headquarters. During the ride defendant made various spontaneous comments. Immediately upon departing the courthouse area defendant stated that a crazy man had picked him up at the DiSimone Cadillac Agency and offered him a ride into town; that he had accepted since he had no other way of getting into town. The crazy man had placed money inside the sport coat pocket, telling him that the money had been owed to defendant. Defendant had not known anything about the crazy man owing him money and did not know how he knew he would be at DiSimone Cadillac.
Shortly thereafter defendant asked rhetorically whether Caggiano was trying to set him up. He then asked why Caggiano had left the scene so quickly and why the police were not going after Caggiano. During the trip defendant removed the money from inside his sport coat pocket and handed it to the officer.

II

The Defense
Defendant, through his own testimony and that of various supporting witnesses, categorically denied any involvement with Caggiano in the alleged wrongdoings. He testified that he had known Caggiano for the past 30 years as a fellow Camden County attorney. Caggiano had rarely appeared before him on any criminal matter during his nine years as a judge. During the 1980-1981 court term he handled the criminal list involving private defense attorneys. On January 6, 1981 he had sentenced Eugene Bocelli to a five-year term. He subsequently denied a motion for reconsideration of sentence brought by Hersh Koslov, Bocelli's attorney, since no new information was presented. By *292 the time a subsequent motion for reconsideration was made in May 1981, however, he had received substantial additional information on Bocelli's behalf. The original jail sentence had initially troubled him greatly. Further, he received correspondence describing the emotional and physical impact the sentence had had upon the Bocelli family. Defendant had learned from Christoper Dietz, the head of the State Parole Board, that Bocelli had been a model prisoner for five months.
According to defendant, on one occasion defendant was in chambers with his law clerk and Yaron Helmer who had prosecuted the Bocelli matter. Helmer told defendant he thought Bocelli had been in jail long enough and that his family had suffered a great deal. Helmer indicated he would contact Koslov to suggest that he make a motion for reconsideration. Defendant subsequently heard the motion and suspended the balance of Bocelli's sentence. He never requested any favors from Helmer nor had he ever discussed the matter with Caggiano. Defendant never received any monies from Caggiano regarding the motion for reconsideration of sentence. Rather, his decision had been solely influenced by the additional circumstances which had come to his attention on Bocelli's behalf.
William Keyser had been indicted and his case assigned to defendant's calendar. A plea arrangement was eventually worked out between the assistant prosecutor and Keyser's attorney, Robert Gambell. However, defendant could not accept the plea arrangement since Keyser could not provide an adequate factual basis for his plea. Eventually, Hersh Koslov was substituted as attorney for Keyser. Koslov had specifically requested the court's approval before taking over the case. Defendant informed Koslov that the Keyser matter was one of the oldest cases on his calendar and that he was anxious to dispose of the matter as quickly as possible in light of the county's speedy trial program.
Koslov was substituted as counsel on September 30, 1981, and on October 7, 1981 defendant adjourned the pending October 19 *293 trial date. Koslov had requested the postponement because of prior commitments and because certain documents necessary for the trial had not yet been received. Defendant was concerned over the delay and established a firm trial date of November 2, 1981. When Koslov informed defendant that this date was also unacceptable because of previous commitments, defendant reluctantly adjourned the matter to November 9, 1981, at which time he indicated that the case would definitely be tried.
On November 4, 1981 Koslov called defendant and indicated he could not be ready to proceed on November 9. He had spoken to the assignment judge of Camden County who had given an indefinite postponement in the Keyser matter. Defendant contacted the assignment judge who confirmed this arrangement, indicating that Koslov should be given a continuance from Monday to Monday.
Defendant testified that on Thursday, November 5, 1981 Caggiano entered his chambers carrying some loose papers and asked him if he could stop at his home that evening to drop some papers off. Defendant did not know what Caggiano was referring to but indicated that he could as long as it was not too late. As he was leaving, Caggiano told defendant that he was going to be getting involved in the Keyser matter and that he had talked to Bob Gambell regarding it. Defendant was surprised at his comment and subsequently spoke to Gambell by telephone. Defendant indicated his desire to get rid of the Keyser matter because it was such an old case. Consequently, he asked if there was a chance that Gambell could get back into the case, but was told that he no longer represented Keyser in the criminal matter. However, he did represent Keyser on the civil matter and intended to meet with him the following Monday. He would advise defendant of the status at that time.
The following day, November 6, 1981, defendant spoke to Caggiano about the Keyser matter on their way to the courthouse in Camden in Caggiano's car. Defendant had received the impression that Gambell would try to dispose of the matter even *294 though Koslov had been substituted as the attorney of record. Defendant told Caggiano that he would probably be receiving a call from Gambell. At no time did he ever ask Caggiano to obtain money from Keyser for any action done in the criminal matter.
Defendant testified he had presided over a trial in which Sergio Morselli and his wife had been charged with arson. Morselli had been convicted while his wife had been exonerated in mid-July 1981. Sentencing had been initially set for September 25, 1981, the date having been set by his secretary upon receipt of the county presentence report. Since the assistant prosecutor involved was unavailable, defendant set a new sentencing date for October 16, 1981. Over the summer Morselli's attorney, Robert Agre, had joined the Attorney General's Office and Nathan Friedman took over the Morselli matter.
The night before the scheduled October 16 sentencing, Agre met Morselli, who was very depressed since he indicated that "they" wanted $18,000 to keep him out of jail. The following morning Agre spoke to defendant in his chambers regarding Morselli's sentence. Agre indicated his close attachment to Morselli which went beyond the lawyer-client relationship. In chambers Agre presented his view that Morselli was entitled to a probationary sentence upon the totality of the circumstances. Defendant acknowledged Agre's position but noted that the prosecutor's office was pushing very hard for a jail sentence. Defendant indicated he would hear the respective arguments of counsel before deciding upon the sentence.
Prior to sentencing, Caggiano entered defendant's chambers and informed him that he represented Morselli on a civil matter arising out of the arson incident. Caggiano asked if there was a chance defendant could postpone the Morselli matter since Morselli had a 75-year-old mother in Italy whom he was trying to help. Defendant noted that any postponement for the case would have to come in open court from the attorney of record. At sentencing, Friedman withdrew the request he had anticipated *295 making for a postponement of the sentencing. Consequently, the sentencing proceeded, concluded by a very emotional plea by Morselli in his own behalf. Because Morselli was so emotionally distraught, defendant felt he was not in any condition to be sentenced that day and therefore postponed the actual imposition of sentence until October 23, 1981. Since one of the two attorneys could not appear that day, he fixed the sentencing date for Monday, October 26, 1981. When he and his secretary subsequently went over the scheduling for that date, however, they noticed the extremely heavy caseload and reestablished a new sentencing date for November 6, 1981. Defendant never discussed the Morselli case with Caggiano with that one exception, and never asked Caggiano to solicit money for the postponement of sentencing or the imposition of a noncustodial term.
When defendant left the courthouse on November 5, 1981, he experienced car trouble. He made arrangements with his car dealer to bring the car in the following morning, and the dealership would provide him a ride to the courthouse. Defendant showered and dressed himself in his normal evening attire, involving undershorts and a T-shirt. He never left home that evening and had no intention of doing so. He told his wife that an attorney was going to stop by that evening at about 6:30 p.m. with some papers; she insisted he wear the trouser part of his pajamas. No one ever came and defendant retired to bed at about 11 p.m.
After awakening and having breakfast, defendant's wife suggested that she follow him to the car dealer and then take him to the courthouse. He indicated his approval but received a phone call from Caggiano which he had not anticipated. As a result of the phone call, arrangements were made for Caggiano to pick him up at the car dealer. He drove to the dealer and left his car before waiting outside for Caggiano to appear.
When Caggiano came shortly thereafter, defendant opened the passenger side door and threw his jacket onto the front seat. *296 He then went into the service area and asked the attendant when his car was going to be ready before returning to Caggiano's car. When he entered the car, he noted that his coat was on the armrest between him and Caggiano, folded backwards.
On two occasions during the ride to the courthouse defendant's jacket fell to the floor. In each instance Caggiano reached and picked up the jacket before putting it over the armrest. Upon their arrival at the courthouse defendant got out of the car with great difficulty. His sport jacket remained inside. Defendant reached in and Caggiano handed the jacket to him, after which he began to put the jacket on. As he did so, he felt a bulge which was a large packet of money and said, "My God, what the heck is this?" As defendant made that comment and held the money in front of him, Caggiano sped away with the door still open. Defendant put the money back in his coat pocket and was approached by three state troopers. He said he immediately pulled the money out and gave it to Detective Rich, telling them to "go after Mr. Caggiano's car. He put this money in my jacket." Defendant testified he then put his jacket on and was escorted to an unmarked patrol car.
On the way to the car defendant asked the officers, "What is happening? What is happening? Why don't you chase the car? Chase the car." On the way to police barracks he said he continually questioned what was happening and asked why the police were not going after Caggiano. He had not known that Caggiano had $12,000 and never saw the money in his life until he discovered it in his jacket pocket.
Defendant presented the testimony of numerous individuals, disclosing that he was known for having an excellent reputation in the community for being truthful and honest, as well as for being law-abiding. In none of the three criminal matters had defendant ever discussed with or suggested to Caggiano that money be solicited or obtained for his conduct as a judge. Defendant categorically denied all charges and was firm in his belief that he was innocent.

*297 III

The Arguments for Reversal

A.
Defendant argues that because the charges against him were comprised of three separate and distinct incidents of bribery and official misconduct, Judge Scalera erred by failing to sever these charges and order three separate trials. The State claims that the charges against defendant demonstrated a common scheme or plan; that they would have been admissible at each of defendant's separate trials under Evid.R. 55, and that all three incidents were thus properly tried jointly without irreparable prejudice to defendant.
R. 3:7-6 provides for the joinder of offenses:
Two or more offenses may be charged in the same indictment ... if the offenses charged are of the same or similar character or are based on the same act or transaction or on 2 or more acts or transactions connected together or constituting parts of a common scheme or plan. Relief from prejudicial joinder shall be afforded as provided by R. 3:15-2.
R. 3:15-2(b) provides that if it appears that a defendant is prejudiced by a joinder of offenses in an indictment, the court "may order an election or separate trials of counts, ... or direct other appropriate relief."
In matters relating to severance, a wide range of discretion necessarily reposes in the trial judge. A denial of a motion for severance will thus not result in reversal, absent a mistaken exercise of that discretion. State v. Sinclair, 49 N.J. 525, 550 (1967); State v. Chaney, 160 N.J. Super. 49, 66 (App.Div. 1978), certif. den. 78 N.J. 405 (1978), cert. den. 440 U.S. 922, 99 S.Ct. 1250, 59 L.Ed.2d 475 (1979); State v. Whipple, 156 N.J. Super. 46, 51 (App.Div. 1978); State v. Cole, 154 N.J. Super. 138, 143 (App.Div. 1977), certif. den. 78 N.J. 415 (1978). Although it is recognized that a trial of multiple charges probably will involve some potential of harm, since the multiplicity alone may possibly suggest to the jury a propensity to criminal conduct, other considerations, such as economy and judicial expediency, must be weighed by the judge in making his determination whether *298 to sever. State v. Maddox, 153 N.J. Super. 201, 206-207 (App. Div. 1977).
The interests of economy and efficiency may require that similar or related offenses be joined for a single trial, so long as the defendant's right to a fair trial remains unprejudiced. State v. Coleman, 46 N.J. 16, 24 (1965), cert. den. 383 U.S. 950, 86 S.Ct. 1210, 16 L.Ed.2d 212 (1966); State v. Keely, 153 N.J. Super. 18, 23 (App.Div. 1977), certif. den. 75 N.J. 613 (1978); State v. Aiello, 91 N.J. Super. 457 (App.Div. 1966), certif. den. 48 N.J. 138 (1966), cert. den. 388 U.S. 913, 87 S.Ct. 2106, 18 L.Ed.2d 1351 (1967).
Defendant essentially contends here that his right to a fair trial was prejudiced because the State attempted to portray each incident as part of a common plan or scheme, whereas the testimony made it "evident" that each incident was not interrelated but was separate as to both time and circumstance. To support this contention defendant points to the fact that the Bocelli incident was completed more than two months before either the Morselli or Keyser incidents were instigated. Defendant does concede, however, that these latter two incidents did overlap with respect to their time frames.
Defendant also claims that no proofs were ever offered to demonstrate that defendant and Caggiano ever had any meetings or conversations in which more than one of the alleged incidents were discussed. This is not a fair statement. The most significant of these conversations, which was tape-recorded and later played to the jury, took place on November 6, 1981, when Caggiano was driving defendant to the courthouse. On that morning Caggiano and defendant spoke about the Morselli matter, and Caggiano in fact transferred the sum of $12,000 to defendant in exchange for defendant's promise to give Morselli a noncustodial sentence. During that same conversation defendant voluntarily initiated a discussion regarding Keyser and Gambell. Defendant made reference to the fact that Gambell, Keyser's former lawyer, might be getting back into the case and that he seemed "gung ho."
*299 There was also testimony from Caggiano that, as early as mid-September, Caggiano had been in defendant's chambers discussing the Morselli matter when defendant initiated the discussion regarding Keyser. On that day defendant had mentioned the sum of $20,000 to Caggiano regarding Morselli, and then suddenly asked Caggiano if he knew an attorney by the name of Robert Gambell. Caggiano said "no," at which point defendant proceeded to tell Caggiano about the circumstances of the arrest of William Keyser, including the fact that Keyser had been apprehended while in the possession of $33,000 in cash. Defendant then told Caggiano to contact Keyser's attorney, Robert Gambell, to see what "arrangements" he could make. All this testimony tends to show that a common thread indeed bound these incidents together, and that an ongoing conspiratorial relationship existed between Caggiano and defendant.
It is clear that where there is a course of conduct on the part of a defendant such as to make evidence of one transaction relevant to any other transaction for the purpose of establishing motive, intent or common scheme or plan, then the trial judges may properly deny severance. This is because a defendant will not suffer any more prejudice in a joint trial than he would in separate trials, because the evidence of the other alleged crimes would be admissible in any event under Evid.R. 55. See State v. Kent, 173 N.J. Super. 215, 220 (App.Div. 1980).
We also note that this defendant was charged with conspiracy in addition to the substantive offenses of official misconduct and bribery. Consolidation for trial of a conspiracy indictment with the underlying substantive offenses is generally considered proper. State v. Cormier, 46 N.J. 494, 504 (1966). The State is not prohibited from charging one master conspiracy in a single indictment, and then establishing at trial that there existed more than one subsidiary transaction or scheme under that master conspiracy. United States v. Kenny, 462 F.2d 1205, 1216 (3 Cir.1972), cert. den. 409 U.S. 914, 93 S.Ct. 233, 34 L.Ed.2d 176 (1972).
*300 Moreover, where the charged crimes were committed in furtherance of a single overall conspiracy, evidence of the acts of any conspirator in furtherance of the common plan, including other crimes, is admissible against all the conspirators. See State v. Louf, 64 N.J. 172, 176 (1973); State v. Yormark, 117 N.J. Super. 315, 336 (App.Div. 1971), certif. den. 60 N.J. 138 (1972), cert. den. sub nom. Mulvaney v. New Jersey, 407 U.S. 925, 92 S.Ct. 2459, 32 L.Ed.2d 812 (1972). So, too, proof of other instances of misconduct which disclose a working relationship between the parties and a common course of dealing leading up to the crimes is admissible. Id. See State v. Harris, 105 N.J. Super. 319, 322-323 (App.Div. 1969); State v. Attanasio, 92 N.J. Super. 267, 269-270 (App.Div. 1966), certif. den. 48 N.J. 354 (1966). Compare Kotteakos v. United States, 328 U.S. 750, 66 S.Ct. 1239, 90 L.Ed. 1557 (1946) (indictment for one conspiracy where there were in fact multiple conspiracies adduced by proof at trial). There is a compelling necessity for the admission of such evidence because the participation in a conspiracy by a defendant is often, if not always, established by circumstantial proofs of general adherence to the goals of the overall conspiracy. See, e.g., State v. Stefanelli, 78 N.J. 418, 428 (1979).
Applying these principles to this case, the trial judge noted that, putting aside principles of judicial economy and convenience, the touchstone issue was ultimate fairness to defendant. He nevertheless found that both the Morselli and the Keyser incidents related back to the original Bocelli incident, insofar as Caggiano's conspiracy with defendant was concerned, and unequivocally found an ongoing relationship and an ongoing conspiracy existing between Caggiano and defendant.
In addition to the issue of conspiratorial relationship, the proof of multiple bribes and multiple acts of official misconduct was important to the State's case in terms of explaining the defendant's nonchalance in accepting the cash payment of $12,000 on November 6, 1981. In the tape-recorded conversation of that morning, when Caggiano handed defendant the $12,000, *301 Caggiano said: "That's twelve there, three, fifteen, I got twenty." Defendant then replied, "How much is there? Nine or twelve?" This conversation obviously takes on added significance when it is considered in the context of Caggiano's prior dealings with defendant.
The State acknowledges that the trial of multiple charges may always involve some potential for harm; nevertheless, as was noted by the Supreme Court in State v. West, 29 N.J. 327, 335 (1959): "That evidence is shrouded with unsavory implications is no reason for exclusion when it is a significant part of the proof. The unwholesome aspects, authored by defendant himself, if the evidence be believed, [may be] inextricably entwined with the material facts."
Finally, the State notes that the jury was specifically instructed to give separate consideration to, and to deliberate separately on, each count of the indictment:
Ladies and gentlemen, the defendant is charged with separate and distinct offenses in each of the six counts of the indictment. You are required to give separate consideration to each of the counts charged. It would be improper for you to reach a particular verdict on one count solely because of the verdict you have reached on another count or counts. You are to consider each count separately in light of the evidence, which has been produced in this trial as that evidence may be applicable to each count and the law to be applied to each count as I have given it to you.
Our system of criminal justice is premised on the belief that jurors can and will respect and follow instructions from the court. State v. Manley, 54 N.J. 259, 270 (1969). Unless defendant can show that the jury deliberately ignored the court's simple and clear instructions, it must be assumed that separate consideration was given to each count of the indictment. We find no error.

B.
During cross-examination, defendant denied receiving $3,000 cash from Caggiano in his chambers on October 23, 1981. The State contended that this $3,000 was part of the $5,500 given by the State to Morselli in the form of 50 one hundred dollar bills *302 and 25 twenty dollar bills. The prosecutor asked defendant if he had been at "Barry Decorators" on October 31. Following an objection on the basis of relevance and a side bar offer of proof, Judge Scalera overruled the objection. Defendant then admitted making a down payment on a rug with five $100 bills. He also admitted that three or four days later he paid the balance of $1,200 with $100 bills.
Defendant argues that this testimony was not relevant and was highly prejudicial. Specifically, he asserts that the mere fact that he made cash payments in those denominations did not support the inference that he had received that money from Caggiano, and that any such inference was further weakened by the passage of a week between the alleged receipt of the money and the payments for the rug. Relevant evidence, however, need only have some tendency to prove a material fact. Evid.R. 1(2).
Relevancy must thus be tested by its probative value with respect to the points at issue. Manieri v. Volkswagenwerk A.G., 151 N.J. Super. 422, 429 (App.Div. 1977), certif. den. 75 N.J. 594 (1978). The true test is the logical connection of the proffered evidence to a fact in issue, i.e., whether the thing sought to be established is more logical with the evidence than without it. 151 N.J. Super. at 429-430.
The evidence need not by itself support or prove that fact. In State v. Smollok, 148 N.J. Super. 382 (App.Div. 1977), certif. den. 74 N.J. 274 (1977), a case in which defendant had been charged with taking large cash bribes, we found that evidence showing five large cash deposits over seven months in a new bank account was properly admissible. Id. at 386. Defendant explained the cash deposits as coming from numerous legitimate sources. We found the evidence to be "highly relevant" to the bribery issue, 148 N.J. Super. at 386, and held that the prosecution was not required to establish a foundation showing of impecuniousness, but that such information could affect the weight of the evidence. 148 N.J. Super. at 386-387.
*303 Caggiano testified that, on the evening of October 22, 1981, Morselli paid Caggiano $5,500 in exchange for arranging the adjournment of his October 26 sentencing date. This money was then shared between Caggiano and defendant. Caggiano testified that on the morning of October 23 he went to defendant's chambers and handed him $3,000. He told defendant that Morselli required two more weeks to obtain the balance of $14,500 and that his sentencing date would therefore have to be adjourned. With Caggiano still in his office, defendant picked up the telephone and called the office of Morselli's attorney. Defendant advised the attorney's secretary that Morselli's new sentencing date was to be November 6.
As the State concedes, the mere possession of a quantity of money is in itself no indication that the possessor was the taker of the money charged to be taken, because in general all money of the same denomination and material is alike. 2 Wigmore, Evidence (3 ed. 1940), § 164 at 601. However, where the denominations of the money possessed and the money taken correspond in a "fairly close way," the fact of the possession of that specific money will have probative value and be found relevant, because the money so possessed is fairly recognized as identical with the money taken. See United States v. Rouse, 494 F.2d 45, 46 (5 Cir.1974) (approximately $49,000 stolen from a bank, $29,000 of which was in $100 bills, testimony admitted showing defendant's purchase of a new Cadillac for $11,000 in $100 bills); State v. Mihoy, 98 N.H. 38, 93 A.2d 661, 662 (Sup.Ct. 1953) (owner of burglarized diner testified that coin box contained approximately two dollars in nickels, dimes and quarters, evidence admitted that defendant gave his female companion two or three dollars in quarters, dimes and nickels on the morning of the burglary); State v. Barry, 43 Wash.2d 807, 264 P.2d 233, 236 (Sup.Ct. 1953) (stolen money consisted of $20,000 in $1,000 and $500 bills, evidence admitted that codefendant was found hiding seven $500 bills within 30 days of the crime); People v. Nicholson, 5 Ill. App.2d 361, 204 N.E.2d 482, 485 (App. Ct. 1965) (robbery victim placed approximately $500, which consisted *304 of one, five and ten dollar bills, in paper bag; testimony admitted that the bills which defendant gave to his accomplice were of the same denominations).
It is the general view that where a defendant is on trial for a crime in which pecuniary gain is the motive, evidence of the sudden acquisition of money by defendant is admissible, even though the source of the money is not traced. The State is not required to establish, however, defendant's financial status prior to the crime, only the sudden acquisition or rise in his financial condition subsequent thereto. "While some jurisdictions may require a showing of the accused's impecuniousness as a prerequisite to the introduction of such evidence when the money has not been traced, ... the better rule is that such a foundation requirement should not be imposed upon the prosecution." State v. Smollok, 148 N.J. Super. at 386-387. As was stated in People v. Nicholson, cited above:
The evidence by itself, of course, [does] not prove criminal conduct. But it is not necessary that every piece of evidence admitted should be sufficient by itself to prove the crime. Evidence which would be colorless if it stood alone may get a new complexion from other facts which are proved, and, in turn, may corroborate the conclusion which would be drawn from other facts. [204 N.E.2d at 486, quoting Justice Holmes in Commonwealth v. Mulrey, 170 Mass. 103, 49 N.E. 91, 94 (Sup.Jud.Ct. 1898)]
Defendant also argues that if this evidence was even "minimally relevant," its probative value was outweighed by "its inherent prejudicial capacity," and that the resulting impact must have been to transform "an otherwise innocuous transaction into a sinister-looking event." As we said in Smollok, defendant was free to attempt to explain the legitimate source of the money. 148 N.J. Super. 387. There was no redirect testimony of defendant here to establish an alternative source for the cash.

C.
During his cross-examination by defense counsel, Caggiano admitted he had not told the Attorney General's representatives about all of his attempts to "fix a case" during his interrogation *305 following his arrest, in spite of their attempts to get him to do so. He admitted during testimony to being involved in at least one, possibly more, such undisclosed attempts. Both the defense and the State questioned Caggiano in detail on his involvement in the "Tortu Case," the only such case he could remember by name. Caggiano did not testify to any other such incidents.
Apparently after the cross-examination of Caggiano but before defendant rested his case, defense counsel became aware that a Lilian Simpson could testify that in October 1981, during Caggiano's representation of her brother, Caggiano told her he would need $100 for the secretary of the municipal court judge and $50 for a policeman involved in the case to assure a favorable outcome for her brother. Defense counsel asked that this evidence be admitted to attack Caggiano's credibility. After an extensive discussion on the record in chambers, Judge Scalera held that admission of the evidence would violate Evidence Rules 20, 47 and 4.
Defendant now urges that the trial judge erred in excluding this testimony: it had not been offered to attack Caggiano's character but to attack his credibility and impeach his testimony that he had not engaged in any other such incidents.
Assuming that the proffered testimony of Simpson was only to impeach the implication of Caggiano's testimony that he had now revealed all such incidents, and not to attack his credibility by demonstrating his bad character, defendant correctly urges that these rules do not mandate that the evidence be excluded. Evid.R. 22 does not require the exclusion of the testimony if the witness was not earlier confronted with it. The Comments to Evid.R. 22(b) interpret State v. Athorn, 92 N.J. Super. 326 (App.Div. 1966), certif. den. 48 N.J. 355 (1966), as implying that if the inconsistent statement is admitted into evidence before the witness has been confronted with it, the witness could be allowed to explain the inconsistencies by rebuttal testimony. N.J. Rules of Evidence (Anno. 1982), Comment 2 to Evid.R. 22. However, the trial judge has the discretion to exclude the evidence under that rule.
*306 Evid.R. 22(d) and Evid.R. 47 require the testimony to be excluded only if an attempt is made to discredit a witness by demonstration of his "bad character." It does not seem even remotely possible that the proposed testimony would show Caggiano's character in any worse light than already had been directly demonstrated.
As an alternative argument, defendant contends "(s)econdly and more importantly," the testimony of Simpson should have been admissible because it was "crucial to the defense." Defense counsel did not address this concern during the trial. However, Judge Scalera did rule that under Evid.R. 4, "the probative value would be outweighed by the prejudice that the jury might be misled or confused...."
Defendant now suggests that this evidence would tend to prove that Caggiano had acted as an independent contractor and not in concert with him. He would then have been able to point to two such incidents in which Caggiano had taken actions without advance agreement with him.[3]
The fact that Caggiano may or may not have solicited bribes from other criminal clients in no way served to exculpate defendant from the bribery charges in the present indictment. The fact that Caggiano may or may not have been involved in other wrongdoings did not serve to bolster defendant's theory that Caggiano was an independent contractor or a sole practitioner. Obviously, sentences could not be fixed without the judicial contact being made. Caggiano, alone, had no power or authority to influence, much less impose, reduce, or determine criminal sentences. Even if Caggiano had another contact in another court, the fact remains that Bocelli, Morselli and Keyser *307 all appeared, or were scheduled to appear, before Coruzzi in Camden County Superior Court.
In a somewhat analogous case, State v. Allen, 139 N.J. Super. 285 (App.Div. 1976), defendant offered the testimony of a witness who would admit that he, the witness, had committed the robbery with which the defendant had been charged. In excluding the proffered testimony this court noted that the robbery had been committed by three people. Thus, the testimony of the witness, even if true, would not necessarily have excluded the hypothesis of defendant's guilt. Since the testimony did not in fact exculpate defendant, it was properly excludable on a discretionary basis because of the potential for misleading or confusing the jury on the single question of the defendant's innocence or guilt. 139 N.J. Super. at 288-289.
Similarly, in State v. Ryan, 157 N.J. Super. 121 (App.Div. 1978), we held that evidence of specific instances of the rape victim's consensual sexual intercourse with persons other than the defendant was not admissible for the purpose of drawing the inference of consent in another instance, citing Evid.R. 47, or for the purpose of impeachment, citing Evid.R. 22. We also noted that the evidence sought to be adduced by the defendant was of such a low probative value as to justify its exclusion pursuant to Evid.R. 4. 157 N.J. Super. at 126.
We also note that Caggiano's in-court statement was not totally inconsistent with Ms. Simpson's proferred testimony. Caggiano testified that there was only one other case that he could think of by name, which he had failed to mention to the authorities, but that there was "perhaps maybe more than one."
In the eloquent words of the late Chief Justice Weintraub in State v. Mathis, 47 N.J. 455 (1960):
We know of no rule permitting the pursuit of a collateral or extraneous issue as some sort of a trial run upon credibility. On the contrary, if a collateral inquiry is pursued upon cross-examination, the answer given may not be disputed by extrinsic evidence unless such extrinsic evidence would be independently admissible upon a substantive issue in the case ... [H]is answer must be accepted, lest the trial become the pursuit of sundry extraneous and distracting subjects *308 which, to boot, the parties are probably unprepared to litigate. [at 470-471; citations omitted]

D.
Defendant next contends that Judge Scalera in charging the jury, unduly emphasized the strength of the State's case while ignoring contentions raised by the defense.
This claim was not raised below. Trial counsel for defendant, who sat through the lengthy trial testimony and who heard the charge to the jury, apparently did not notice any such undue emphasis on the State's evidence. In fact, when asked by Judge Scalera if he had any exceptions to the jury charge, defense counsel replied, "No, Your Honor." Thus, we deal with the issue on a plain error basis.
Judge Scalera provided each attorney with a copy of his 33-page proposed charge and gave them a half-hour to review it, and then held a "charge conference" on the record the day before counsel presented their summations and he charged the jury. He invited the attorneys to comment on his charge but reserved the right to add comments or "ad lib" when he addressed the jury. He first noted that the State had presented formal requests to charge as well as a brief. Although defense counsel declined the opportunity to present formal requests to charge, Judge Scalera gave him the opportunity to present informally exceptions to the proposed charge. Defense counsel presented a few issues which were apparently resolved to his satisfaction as they are not raised on appeal.
A judge must leave to the jury the ultimate determination of facts and the rendering of a just and true verdict, but he has the right, and indeed the duty, to review the testimony and to comment upon it. State v. Laws, 50 N.J. 159, 177 (1967), mod. o.g. 51 N.J. 494 (1968), cert. den. 393 U.S. 971, 89 S.Ct. 408, 21 L.Ed.2d 384 (1968). It is not erroneous for a trial judge to review the facts and highlight inconsistencies, and to instruct the jury to use its common sense in determining the truth. *309 State v. Johnson, 159 N.J. Super. 26 (App.Div. 1978). As Chief Justice Gummere succinctly stated in State v. Bertchey, 77 N.J.L. 640 (E. & A. 1909):
That a judge has a right to give his own views to the jury with respect to the value of the testimony, or upon the merits of the case, is, and always has been, the law of this state ... Under our system of jurisprudence a trial judge is not only justified in pointing out to the jury what seem to him to be the salient features of the case, but it is always his right, and, frequently, his duty, to go further, and give the jury the benefit of his greater experience by telling them how the testimony strikes his mind, both as to its force and as to the inferences he would draw from it.... [77 N.J.L. at 643-644; citations omitted]
In this case the trial judge gave emphatic and repeated instructions to the jury that the ultimate decision of fact was being left in their hands; that they were not bound by any of his comments or opinions, and that only they could resolve conflicts in testimony and decide where the truth lies. The judge then went on to explain and define the elements of each offense with which defendant was charged. After each explanation he summarized the nature of each offense in terms of the allegations made by the State in the indictment, and thus made it clear to the jury that, unless it was convinced beyond a reasonable doubt that the State had proved these allegations, defendant could not be found guilty. For example, in explaining the offense of official misconduct to the jury, Judge Scalera concluded by saying:
As I have explained, the State contends in Count 2 that the defendant committed the crime of misconduct based on three different incidents. It is not necessary for you to find beyond a reasonable doubt that the defendant was guilty of misconduct regarding all three, but you may return a verdict of guilty to this count if you are satisfied beyond a reasonable doubt that the defendant committed such misconduct based on any one or more of those three incidents. You will recall that one of the acts of misconduct, which the State claims was committed by the defendant, occurred when he allegedly initiated, or caused an application for a change of sentence to be filed on behalf of Eugene Bocelli, so that he could then change the sentence to one resulting in Bocelli's release from imprisonment.
Now, obviously no Judge is authorized to initiate, or cause such a motion to be filed, because he expects to be secretly and illegally paid for it. He also has the affirmative duty to disclose that he is receiving a payment for the performance of a judicial act or function not authorized by law, such as a bribe. In order for you to convict the defendant of misconduct on the basis of this allegation you would have to find beyond a reasonable doubt that this defendant did, indeed, *310 purposely and knowingly initiate, or cause that motion to be filed, that he did so in exchange for money or the expectation of money, that he knew the manner in which he caused the motion to be filed was clearly not authorized or that he knowingly failed to advise the prosecutor that he was making the request for that reason.
The State further contends that the defendant also committed misconduct in postponing the October 16th sentence date of Sergio Morselli in exchange for money he had already received and also to allow Morselli to raise the additional monies the defendant expected to receive in exchange for a non-custodial sentence. In that regard I instructed you that no Judge is authorized by law to postpone a sentence for money not otherwise authorized by law or for the purpose of obtaining a bribe. Further, he is under an obligation to disclose the act that he has received or expects to receive such money not authorized by law. In order for you to convict the defendant of misconduct on the basis of this allegation, or incident you would have to find beyond a reasonable doubt that the defendant, Peter J. Coruzzi, purposely and knowingly postponed the sentence because of money he had received and because he wanted to allow Morselli time to raise money for the bribe related to the sentence to be imposed.
The State further contends that the defendant also committed misconduct by endeavoring to influence a substitution of attorney representing Mr. Keyser in his pending criminal matter, so that he could then arrange a bribe in connection with Keyser's sentence. In this regard I instruct you that there is nothing improper or illegal for a Judge to secure or attempt to secure a change of attorneys as a means of securing a quicker disposition of the case, to prevent further delays of the case or out of a sincere and good faith desire to protect the rights of the criminal defendant. But no Judge is authorized by law to initiate or attempt to secure a change in attorneys with the intent to facilitate or arrange a bribe in connection with that case. Further he is under an affirmative duty to disclose that his motive for securing or attempting to secure a change of counsel is in expectation or hopes of securing such monies not authorized by law.
In order to convict the defendant of misconduct on the basis of this allegation you would have to find beyond a reasonable doubt that the defendant knowingly and purposely set about to have Mr. Gambell again become Mr. Keyser's lawyer in the criminal case pending before the Judge in order that he directly or indirectly could then arrange a bribe involving Mr. Keyser's case.
As can be seen, any reference to the evidence in the case was made solely within the context of the statutory elements of each offense which the State was required to prove for conviction. If the proof actually presented at trial had differed from the judge's statement of what the State alleged, the jury was charged to acquit. There is no statement by the judge that the evidence was as the State alleged. We find there was in fact no comment by him as to what the evidence actually was, and, therefore, no error can have resulted from his clear explanation of the charges.
*311 Defendant also argues that Judge Scalera's charge to the jury was "virtually identical" to that discussed in Williams v. United States, 93 F.2d 685 (9 Cir.1937). In Williams the district judge detailed the prosecution's evidence to a great extent but only once referred to defense testimony (which comprised 270 pages out of 656 pages of trial transcript). In that one instance the district judge read 17 pages of the defense testimony, compared it with the prosecution's testimony and then presented the "motivating interest" that might have prompted the defense witness to so testify. 93 F.2d at 693. These errors were added to the time the district judge spent examining the witnesses, which comprised 220 pages of trial transcript. By these actions, the circuit court concluded, "the learned trial court passed beyond the immemorial limits set down for Anglo-American tribunals." Id. at 692.
We fail to see the slightest resemblance of the charge in Williams to that given by Judge Scalera here. Judge Scalera's charge stayed well within the bounds of propriety. He began by cautioning that the redacted copy of the indictment that would be in the jury room was not evidence of guilt but only indicated the charges they must consider. He emphasized that they were the sole judges of the facts and of the weight to be given the evidence. He reminded them that any comments he might make or had made during trial on the evidence were not to be considered binding on them; only they could find the facts. He consistently reminded the jury of these instructions during his charge.
We agree with the State's observation that if the evidence appeared to be too one-sided here, then it was due to the nature of the evidence that was presented, rather than to any fault on the part of the trial judge.

E.
Defendant contends that the trial judge failed to instruct the jury adequately on the concept of aiding and abetting since he *312 failed to inform the jury of the criminal intent necessary to be culpable as an accomplice. He contends that "the jury was never informed that defendant to be criminally culpable as an accomplice, had to share the same requisite intent of Caggiano necessary for the actual commission of the particular offense." Further, defendant contends that the judge only briefly discussed accomplice liability and thus failed to inform the jury fully on that issue.
It is well-settled that an accused is entitled to assume that the elemental principles governing the charge against him will be covered in the jury instructions. The requirement that a judge instruct the jury as to the law governing the issues to be decided under the facts of the particular case is absolute. State v. Butler, 27 N.J. 560, 596 (1958). Nevertheless, in passing upon the propriety of a trial judge's charge, a reviewing court should examine the entire charge. The test is whether the charge in its entirety was either ambiguous or misleading. State v. Brown, 46 N.J. 96, 101 (1965); State v. Gallicchio, 44 N.J. 540, 549 (1965); State v. Hipplewith, 33 N.J. 300, 317 (1960). Portions of the charge cannot be dealt with in isolation. The charge must be read as a whole in context of the factual and legal issues presented in order to ascertain whether it fairly set forth the controlling legal principles and fairly submitted the crucial factual issues to the jury. State v. Freeman, 64 N.J. 66, 69 (1973); State v. Wilbely, 63 N.J. 420, 422 (1973); State v. Brown, 131 N.J. Super. 228, 233 (App.Div. 1974), aff'd o.b. 66 N.J. 146 (1974). If, on reading the charge as a whole, prejudicial error does not appear, then the verdict must stand. State v. Thompson, 59 N.J. 396, 411 (1971); State v. Council, 49 N.J. 341, 342 (1967).
Defendant contends that the jury was erroneously permitted to convict him even if he did not possess the criminal state of mind necessary to commit the offenses. Defendant's theory is that the jury "could only have convicted the defendant as an accessory rather than a principal." Since the judge failed to *313 instruct the jury that it was essential to determine that defendant, in "aiding" Caggiano, shared the same "mens rea" as Caggiano, defendant contends that his conviction is somehow tainted. This theory is founded on two erroneous assumptions, first, that defendant could be guilty only as an accessory, rather than as a principal; and second, that the judge failed to instruct the jury on the necessary mental elements of accomplice liability.
With respect to the first assumption, the evidence produced in the State's case overwhelmingly tended to establish that defendant was guilty as the principal, or "mastermind," of the bribery operation: the testimony of the State's witness was that on more than one occasion defendant initiated the subject of pay-off money to Caggiano; it was defendant who suggested the names of the criminal targets to be solicited, the names of those defendants' attorneys, and the amounts that should be collected, and it was defendant who took the larger share of each pay-off, and who suggested the method and timing of each sentence to be fixed. Although Caggiano did the leg work and made the actual contacts, and actually received the money, it was at the direction of defendant himself.
As to defendant's second assumption, Judge Scalera correctly stated the controlling principle of law with respect to accomplice liability. In originally defining an accomplice the judge stated: "[A] person is an accomplice of another person in the commission of an offense if with the purpose of promoting or facilitating the commission of the offense he ...." (emphasis supplied). He then went on to discuss an accomplice's acts of soliciting, aiding, agreeing to aid, attempting to aid, or failing to prevent the offense while having a legal duty to do so. He concluded by saying: "[Y]ou will consider then whether or not you are convinced beyond a reasonable doubt that the defendant did knowingly and purposely promote or facilitate Caggiano's commission of any such offense...." He later gave precise and detailed definitions of the terms "purposely" and "knowingly."
*314 We have no difficulty in finding that Judge Scalera informed the jury on the law of accomplice liability. We add that there was no rational basis in the evidence for the jury to believe that defendant had knowledge that a crime was going to be committed and merely failed to act. Defendant's conduct in the scheme far exceeded the bounds of bare knowledge.

F.
Defendant contends that the cumulative effect of errors committed by the trial judge operated to deny him a fair and impartial trial.
It is beyond cavil that incidental legal errors which occur in a trial but which do not prejudice the rights of defendant or make the proceedings unfair, may not be invoked to upset an otherwise valid conviction. State v. Orecchio, 16 N.J. 125, 129 (1954). Any error or omission should be disregarded by the appellate court "unless it is of such a nature as to have been clearly capable of producing an unjust result...." R. 2:10-2. Not every trial error requires a reversal. State v. LaPorte, 62 N.J. 312, 318-320 (1973). The test for reversal is whether there is a degree of possibility that the alleged error led to an unjust verdict. State v. Macon, 57 N.J. 325, 336 (1971). The possibility must be sufficient to raise a reasonable doubt as to whether the evidence led the jury to a result it otherwise might not have reached, and thus denied defendant a fair trial and fair decision on the merits. 57 N.J. at 336, 338.
The evidence against defendant here can be classified as nothing less than overwhelming. In addition to the testimony of Caggiano, the State produced the testimony of an assistant prosecutor, criminal defense attorneys, deputy attorneys general, and state police detectives. The most damaging testimony against defendant came in the form of the tape-recorded conversation in which the jury heard defendant himself utter the words which indicated that he clandestinely plotted with Caggiano *315 to accept money in exchange for fixing or reducing sentences.[4]
Defendant could only offer general denials to the charges in the face of all of this overwhelming evidence. He explained his conversation with Caggiano on the morning of November 6, 1981, during which various amounts of money were discussed, as nothing more than the recitation of arithmetic tables by the two. When asked how he knew that Caggiano had seen Morselli the night before, he could only reply that he had, for some reason, come to that conclusion in his own mind. When asked why he told Caggiano to tell Morselli to "non parlare" (i.e., "don't talk"), he could only reply that, although he had indeed uttered those words, he did not know what that Italian phrase meant. When questioned with respect to why he asked Caggiano if anyone had followed Caggiano home the night of November 5, he could only reply that Caggiano looked disorganized on the morning of November 6, and that he thought Caggiano had been out with another woman.
Defendant was tried before a foreign and impartial jury. Testimony was presented for more than two full weeks. The jury deliberation did not take place until the court had delivered a carefully worded charge, to which no exceptions were taken. Every conceivable precaution was taken to safeguard defendant's rights. There is simply no legal basis upon which to justify a reversal of defendant's conviction. Certainly there is no moral basis.

G.
Defendant argues that the five-year custodial sentence imposed is manifestly excessive. As we have noted, the trial judge merged and dismissed the convictions on both the first and second counts. Defendant was sentenced to five years imprisonment on each of the third, fourth, fifth and sixth counts, all to *316 be served concurrently. Bribery is a second degree crime, N.J.S.A. 2C:27-2. N.J.S.A. 2C:44-1(d) provides that there shall be a presumption of imprisonment of one who has been convicted of such a crime unless the sentencing court, "having regard to the character and condition of the defendant ... is of the opinion that his imprisonment would be a serious injustice which overrides the need to deter such conduct by others." N.J.S.A. 2C:43-6 a(2) establishes that a term of imprisonment between five and ten years shall be imposed for a second degree crime. N.J.S.A. 2C:44-1(f) establishes a presumptive sentence of seven years.
N.J.S.A. 2C:44-1(a) and (b) allow the sentencing judge to consider certain aggravating factors in establishing the sentence. Judge Scalera considered each of the suggested factors and found, and stated on the record, the following to be relevant:
1. The nature and circumstances of the offense and the role of the actor therein;
........
4. A lesser sentence will depreciate the seriousness of the defendant's offense because it involved a breach of the public trust under Chapters 27 and 30;
........
7. The crime was committed pursuant to an agreement that defendant be paid for the commission, and
........
9. Deterrence of defendant and others.
He found the following mitigating factors to be relevant:
1. Defendant's conduct neither caused nor threatened serious harm (although Judge Scalera noted this was only true if speaking of bodily harm and not harm to the Criminal Justice System);
........
7. Defendant has no history of prior delinquencies or criminal activities;
8. Defendant's conduct was the result of circumstances unlikely to reoccur. The judge noted this was only true now that defendant has been removed from the bench;
9. Defendant is unlikely to commit another offense, and
........

*317 11. Imprisonment would entail excessive hardship for himself or his dependents.
Judge Scalera observed that factor (11) was true in almost all cases of imprisonment. He was fully aware of defendant's serious medical condition. He felt a certain empathy for defendant; they both came from very similar family backgrounds and histories up until the point "that Peter J. Coruzzi chose a different fork in the road." He was mindful of the faith defendant's family and friends maintained in defendant.
Nevertheless, Judge Scalera recognized that defendant had been convicted of very serious crimes:
Peter Coruzzi, you have defaced the image of justice in this case. You have done violence to your oath of office. You have undermined the public confidence in the judicial branch of government. You have breached faith with your sister and fellow judges. You have set back the traditions of justice and adversely affected the integrity and reputation of the New Jersey Judicial System. You, as a Superior Court Judge, were entrusted to judge the guilty and you must now stand to be judged as such.
You have given in to temptation and you have abused the great power reposed in you as a judge of this state.
Judge Scalera could find "no sensible excuse" for defendant's offense. In his efforts to be fair, impartial and compassionate he rejected the prosecutor's request of ten years and imposed five-year concurrent sentences. Defendant acknowledges that a sentence should be reversed "only if it was so excessive as to constitute an abuse of discretion." State v. Butler, 89 N.J. 220, 232 (1982). A "clear and compelling finding of miscarriage of justice" must be shown. State v. Whitaker, 79 N.J. 503, 514 (1979). While an appellate court has the power to modify a manifestly excessive criminal sentence, "the power is one which should be exercised sparingly and only upon a `clear showing of abuse of discretion.'" Id. at 512; citation omitted.
We agree with Judge Scalera's appraisal of the aggravating and mitigating factors related to defendant's conviction. We also agree that because of the enormity of the offenses, imprisonment was required. Even considering that defendant by his conviction has forfeited his profession, his office and his *318 status in society, we believe that Judge Scalera was far less severe than he might have been in imposing the five-year concurrent sentences. We make this observation, not to deprecate the judge's action, but to emphasize that the sentence imposed is not excessive, and certainly not manifestly excessive.

IV

The Supplemented Record and Defendant's Pro Se Argument
On January 3, 1983 defendant moved to expand the appellate record with two affidavits, and to file a pro se supplemental brief alleging ineffective assistance of counsel. We denied the motion on January 7, 1983. On January 24, 1983 our order was summarily reversed by the Supreme Court and the cause was remanded to this court for supplementation of the record and to permit defendant to file a pro se supplemental brief.
Defendant's supplemental argument is very brief. We set out the gist of it in defendant's words:
Accordingly, the fairness of the trial in this case becomes the issue. One of the most important factors, guaranteed by the Sixth Amendment to the U.S. Constitution to protect and preserve the fairness of trials, is the right to be represented by counsel. This right includes the right to effective assistance of counsel and includes the right to meaningful participation with counsel in the preparation of a defense. State v. Melvins, 155 N.J. Super. 316 (App.Div. 1978).
The affidavits of Peter J. Coruzzi, J.S.C., and Dr. DiMarino attest to the defendant's inability to have any meaningful participation in the preparation and conduct of trial. The affidavits of Joseph Coruzzi and the corroborating affidavits, together with Appellant's affidavit, clearly support appellant's position that he did not receive a fair trial due to his counsel's failure to call a number of witnesses. If this court examines that content of the testimony, it will find that it all supports the defendant/appellant's version of the events leading up to and including the date of arrest. The credibility of these witnesses is not important here, that is indeed within the jury's domain. The question is whether the defendant had the fair benefit of having all supportive testimony considered. It is respectfully submitted that the answer to this question is, no.
The right to counsel afforded criminal defendants by the State and Federal Constitutions encompasses the right to effective assistance of counsel. State v. Mingo, 77 N.J. 576 (1978); State v. Bentley, 46 N.J. Super. 193 (App.Div. 1957); State v. Pace, 171 N.J. Super. 240 (App.Div. 1979). It is likewise true that a conviction will not be overturned on the grounds of ineffective assistance unless the inadequacy is of such magnitude as to render the trial a farce or mockery. *319 State v. Pace, supra at 251; State v. Edge, 57 N.J. 580, 593 (1971). As noted in State v. Pace, this test has been soundly criticized in other jurisdictions, however, it remains the law in this State.
Taking all the facts presented in the affidavits found in the Appendix hereto including:
A. Appellant's physical, mental and emotional state;
B. The failure to call a crucial witness who would have testified as to Appellant's actions on the date of arrest and another who would have verified that crucial witness's testimony;
C. The failure to call witnesses who would have testified as to defendant's intent to sentence Sergio Marselli to a term of imprisonment;
D. The failure to call witnesses who could have attested to Appellant's lifestyle;
lead to the conclusion that there was indeed a mockery, indeed a farce, committed at trial. Accordingly, Appellant must be afforded relief in order to vindicate the right to a fair assessment of his guilt or innocence, his right to liberty itself.
Defendant's pro se argument is that he was deprived of a fair trial because he was denied the right of effective assistance of counsel. The State contends that, even assuming arguendo that all of the allegations in defendant's affidavits are true, nothing contained therein would support a finding of inadequate assistance of counsel.[5]
It is beyond dispute that the Sixth Amendment[6] not only provides defendants in criminal proceedings the right to assistance of counsel, but also guarantees that such assistance be effective. Cuyler v. Sullivan, 446 U.S. 335, 344, 100 S.Ct. 1708, 1716, 64 L.Ed.2d 333 (1980); State v. Mingo, 77 N.J. 576, 581 (1978); State v. Pace, 171 N.J. Super. 240, 251 (App.Div. 1979), certif. den. 84 N.J. 384 (1980). The standard for determining whether representation by counsel is effective has been long settled in this State. In State v. Dennis, 43 N.J. 418 (1964), the court held that an otherwise valid conviction will not be upset *320 because of ordinary dissatisfaction with counsel's exercise of judgment in his conduct of the trial. Id. at 428. To warrant reversal, counsel must have been so inadequate as to render the trial a farce or mockery of justice. State v. Edge, 57 N.J. 580, 593 (1971); State v. Pace, 171 N.J. Super. at 251. "Mere improvident strategy, bad tactics or mistake do not amount to ineffective assistance of counsel unless, taken as a whole, the trial was a mockery of justice." State v. Bonet, 132 N.J. Super. 186, 191 (App.Div. 1975).
Defendant claims that his attorney's failure to call several witnesses at his trial must lead to the conclusion that his trial was nothing more than a farce or mockery of justice. Defendant's supplemental affidavit indicates that at least five persons whose testimony would have allegedly corroborated defendant's contention that Louis Caggiano was an "independent contractor" with no judicial contacts, were not called as witnesses. Defendant has failed to produce affidavits from any of these proposed witnesses, except in the case of his brother.
We have doubt as to whether any of the proposed testimony could have been legally admissible in evidence in any event. Caggiano's activities on other specified occasions with other specified people had no relevance whatsoever to his dealings with defendant on the occasions testified to in this case. The issue of Caggiano's dealings with other individuals was never disputed at trial, because Caggiano clearly admitted that defendant "reached out" to him because of his reputation in such matters. Testimony of the nature proffered would have resulted in undue consumption of time as well as substantial danger of confusing the issues and of misleading the jury. See Evid.R. 4. In addition, other acts of Caggiano which did not result in a criminal conviction would not have been admissible to attack Caggiano's credibility. See N.J.S.A. 2A:81-12. Nor would evidence of specific instances of Caggiano's conduct, relevant only as tending to prove a trait of his character, have been admissible. See Evid.R. 22(d). Finally, specific instances *321 of Caggiano's conduct, not the subject of a criminal conviction, would not have been admissible if offered for the purpose of drawing inferences as to the conduct of Caggiano on the occasions relevant in this trial. See Evid.R. 47.
Considering these principles, the failure of defendant's attorney to elicit such testimony can hardly be deemed constitutionally unfair where this testimony would probably have been inadmissible in any event. We do not believe that testimony regarding Caggiano's allegedly "independent" dealings with other people would have been able to negate the very damaging testimony to the effect that defendant actually reduced Eugene Bocelli's sentence, that defendant first postponed and then continued Sergio Morselli's sentencing date, and that defendant asked a less experienced attorney to become involved in the trial of William Keyser.
In any event, the decision at trial as to what testimony to present is clearly a matter of trial strategy which is entrusted to the sound discretion of competent trial counsel. As we stated in State v. Bentley, 46 N.J. Super. 193 (App.Div. 1957):
A failure of competent counsel in a criminal case to present certain evidence or to advance certain contentions, whether such non-action represent an error of judgment or mere inadvertence, does not constitute denial of due process of law, even though such failure result in a conviction which perhaps might have been avoided. The constitutional requirement is satisfied when the defendant has had the benefit of the advice and guidance of a reputable and competent attorney. [at 203][7]
Defendant's second affidavit, signed by his brother, alleges that Joseph Coruzzi could have testified as to the events of the morning of November 6, 1981, but that counsel never called him as a witness. In addition to the fact that Joseph Coruzzi had an obvious interest in testifying on behalf of his brother, the State *322 also suggests that defense counsel may very well have, as a matter of trial strategy, chosen not to call defendant's brother because the dubious nature of his testimony would have served only to undermine the entire defense strategy. Defendant himself, while on the stand, never once alluded, either on direct or cross-examination, to the fact that his brother was at the courthouse that morning. Moreover, defense counsel well knew that the brother's story ran directly contrary to the testimony of several deputy attorneys general and numerous state police detectives, all of whom were present at the courthouse on the morning of defendant's arrest. To have asked the jury to believe that defendant's brother was on top of the courthouse steps and that he actually saw defendant look at the $12,000 and heard defendant "yell and scream" as Caggiano pulled away  purported facts contradicted by the observations of all persons actually present  would have been tantamount to an insult to the intelligence of the jury members.
With respect to the affidavits given by defendant's court attendants, the single observation is that defendant probably did have every intention, prior to November 6, 1981, of giving Sergio Morselli a jail term. It was not until that date that defendant actually received the balance of the money that was to be paid to insure Morselli a noncustodial sentence. The crux of the State's position at trial was that, had defendant not received the $12,000 on the morning of November 6, 1981, Morselli was going to be sentenced to jail. The fact that defense counsel met with the court attendants prior to trial and was thoroughly familiar with the testimony that they could have offered, indicates a conscious strategic decision on his part not to use these witnesses at trial.
Defendant also has submitted affidavits signed by relatives which, he claims, go to show that these relatives could have testified to defendant's "life-style." The State did not have to prove that defendant spent any of the money he received in any particular fashion. All that the State had to show was that defendant obtained the money illegally. Defense counsel's failure *323 to introduce such irrelevant testimony cannot be deemed indicative of lack of proper representation.
Again, an examination of the affidavits signed by defendant's relatives discloses that defense counsel met with each relative at length prior to trial and that the proffered testimony was discussed. We are thus not presented with a situation where trial counsel failed to prepare his case before trial or where he deliberately ignored crucial testimony. The decision not to offer the testimony of particular witnesses is obviously a matter of trial strategy that cannot now support an allegation on appeal of ineffective assistance of counsel. See State v. Bentley, 46 N.J. Super. at 203.
As to the affidavit signed by defendant's physician to the effect that defendant was not physically or emotionally able to assist his counsel in the preparation of his defense, the State answers that this court is not the proper place to adjudicate defendant's prior competency to stand trial. The Code of Criminal Justice provides clear standards for determining a defendant's competency to stand trial. The ability to assist one's counsel in the preparation of one's defense is only one of numerous factors to be considered. See N.J.S.A. 2C:4-4(b)(2)(g). The Code provides for a very specific procedure whereby a defendant may seek to challenge his competency. See N.J.S.A. 2C:4-5. At no point in the proceedings below did defendant indicate his desire to use these proceedings, nor did his demeanor or conduct at any point sufficiently place the issue before the trial judge.[8]
*324 By defendant's own admission, his failure to communicate adequately with his attorney arose from his own unwillingness to take responsibility for his reprehensible conduct and to admit his guilt. A defense attorney is not expected to do more for his client than the client is willing to do for himself.
Defendant was represented at trial by counsel of his own selection, an attorney who has a fine reputation as a trial lawyer and who is regarded by many as being one of the ablest criminal defense lawyers in this State. Our reading of the trial record satisfies us that counsel's reputation was evident in his conduct of this trial. He faced almost overwhelming proof of defendant's guilt, including a tape recording the content and clarity of which were impossible to overcome. Defense counsel, while a fine lawyer, is not a magician, and the latter is what defendant would have needed to have been acquitted of the charges here.
We note that prior to being sentenced, defendant thanked and praised counsel for his efforts on his behalf:
There was no help I could make to my attorney by way of suggestions. Much his senior I practiced at the Bar for 25 years, I was never known to be eloquent or erudite but I was adequate and successful and I loved the practice of law and yet I had an attorney who has been practicing for ten, twelve, fifteen years and I was of no assistance to him. He might as well have been talking to the wall, your Honor, when he spoke to me. And yet, yet Mr. Poplar visited my office, my home and we sat for three and a half hours and we talked. We talked. And it concluded by saying maybe next week we'll have a sandwich and a beer, Judge, because my lawyer still doesn't know me. He doesn't know Peter J. Coruzzi. So he said write down what you think. Write down the thoughts that you have.
........
I say to my lawyer, thank you Mr. Poplar. But we still don't know each other. You still don't know what makes me tick.
........
To my attorney, Mr. Poplar, I say thank you. I say thank you for an effort. You like to use apples and oranges? I'm telling you that it was lobsters and hot dogs. I'm sorry we didn't get to know each other. I'm sure I was your worst client. I must have been your worst client.

*325 A man with my experience could have been more of an assistance to you, Mr. Poplar, and everybody needs assistance, your Honor. Everybody needs assistance. That's what distinguishes us from animals. The little things. The little things distinguish us and the phone never rings and the phone never rings.
Mr. Poplar was in my home yesterday for three and a half hours. The phone rang three times. My brother, my son, and my wife. But the phone never rang.
It ill behooves defendant at this juncture to criticize counsel and claim his ineffectiveness based on the flimsy grounds set forth in the affidavits, including the proposed deus ex machina in the person of his brother Joseph Coruzzi. We find absolutely no merit in this supplemental argument.
We have patiently and painstakingly reviewed the trial record of this case, and we have carefully reviewed the precedents controlling the legal issues raised before us. And while we agree with defendant that it is inevitable that certain emotions flow from the fact that defendant at the time of his conviction was a Superior Court judge, we have nevertheless considered the merits of this appeal dispassionately. Our conclusion, however, contrary to that suggested by defendant, is that justice has been done.
The judgment of conviction is affirmed.
NOTES
[1] There is no suggestion in the record that Koslov knew anything about Caggiano's dealings with Philip Bocelli.
[2] Excerpt from consensual conversation 11/6/81 between Louis Caggiano, LC and Peter J. Coruzzi, PC

........
LC: And you talk about that Sergio not being jail material. Christ Almighty, I don't know if he's going to live to get to Court.
PC: Why, what's the matter.
LC: He's nervous as hell.
PC: He's ready. He's been nervous.
LC: There's twelve there. Three, fifteen, I got twenty
PC: Twenty total
LC: Twenty
PC: How much is here, nine or twelve
LC: Twelve
PC: All right
LC: Twelve is there. Traffic is pretty bad here isn't it.
[3] The Tortu case involved an attempt by Caggiano to get defendant to have the case placed on his criminal list. Caggiano offered defendant $20,000 if he could handle the case and impose suspended sentences. Defendant allegedly declined because of the improper appearance that would be created by attempting to have the case switched to his list. Both Tortu brothers also declined to pay Caggiano and reported the proposal to their attorney.
[4] See footnote at 289, 290.
[5] Defendant has included in his pro se appendix six affidavits that were not included in his original motion to expand the record. We, nevertheless, have reviewed them all.
[6] U.S. Const., Amend VI. The parallel provision in the New Jersey Constitution is found at N.J. Const. (1947), Art. I, par. 10.
[7] Even under a more stringent standard of review, expressed by the Third Circuit, such as "customary skill and knowledge," defendant's trial representation would be constitutionally adequate. See United States v. Baynes, 687 F.2d 659, 665 (3 Cir.1982). "Perfection is hardly attainable and certainly is not the general rule, ... since what is required is normal and not exceptional representation." Moore v. United States, 432 F.2d 730, 736 (3 Cir.1970).
[8] N.J.S.A. 2C:4-5(a) provides that when there is "reason to doubt" the defendant's fitness to proceed to trial, the court may, on its own motion or on motion by either party, appoint a psychiatrist to examine the mental condition of the defendant. This psychiatrist, however, must be from a list agreed to by the court and both parties, or else must be specifically agreed to by the court and both parties. See N.J.S.A. 2C:4-5(a)(1) and (2). If the psychiatrist's report is contested, a hearing must be held by the trial court. N.J.S.A. 2C:4-6(a). If the defendant indeed lacks fitness to proceed, the court may place him in an appropriate institution or may release him to out-patient treatment until such time as it can be determined whether the defendant will regain his competence within the foreseeable future. N.J.S.A. 2C:4-6(b).