**NOT FOR PUBLICATION WITHOUT THE
APPROVAL OF THE APPELLATE DIVISION**

This opinion shall not "constitute precedent or be binding upon any court." Although it is posted on the internet, this opinion is binding only on the parties in the case and its use in other cases is limited. R. 1:36-3.

SUPERIOR COURT OF NEW JERSEY
APPELLATE DIVISION
DOCKET NO. A-4923-16T4

STATE OF NEW JERSEY,

     Plaintiff-Respondent,

v.

MICHAEL SAMPSON, a/k/a
MICHAEL PEREZ, JOSE
GONZALEZ, and JOHN
SAMPSON,

     Defendant-Appellant.

_____

Submitted October 22, 2019 – Decided November 25, 2019

Before Judges Fisher, Accurso and Rose.

On appeal from the Superior Court of New Jersey, Law Division, Bergen County, Indictment No. 13-01-0098.

Joseph E. Krakora, Public Defender, attorney for appellant (Alison Stanton Perrone, Designated Counsel, on the brief).

Mark Musella, Bergen County Prosecutor, attorney for respondent (Jenny Xiaoying Zhang, Assistant Prosecutor, of counsel and on the brief).

PER CURIAM

In appealing his convictions for murder, as well as various weapons and drug offenses, defendant contends the trial judge erred in denying his motions for a severance and for substitution of counsel, in limiting his cross-examination of a prosecution witness, and by imposing an excessive sentence. Because we agree with defendant's argument that the trial judge's denial of severance constituted an abuse of discretion, and because the circumstances that preceded sentencing provided grounds for the trial judge's recusal, we vacate the judgment of conviction and remand for separate trials before a different judge.

I

Because the severance issue that undergirds our disposition requires consideration of the prosecution's allegations in this multi-faceted indictment, we discuss the evidence at some length. During the course of a twenty-one-day trial in October, November and December, 2016, the jury heard evidence that, in July 2012, defendant and his wife, Jacqueline Pierro, resided in Garfield with two teenage children from prior relationships and their own two younger children, M.S., who was just a toddler, and A.S., then an infant. Defendant was the sole breadwinner and supported the family by working in his own body shop while managing another. When defendant lost the latter job, the family began

2

experiencing financial problems. According to Pierro, the couple resorted to selling marijuana to make ends meet. Defendant's cousin supplied the marijuana, defendant packaged it, Pierro and defendant sought buyers, and defendant completed the sales.

During the afternoon of July 7, 2012, defendant and Pierro delivered marijuana to a customer and then stopped by the Cliffside Park home of Lydia Homsi, Pierro's longtime friend. A children's birthday party was underway; outside, Pierro attempted to find buyers by asking another friend whether anyone was interested. There were no takers, and defendant and Pierro returned home.

Around 10:30 p.m. that evening, defendant and Pierro drove back to Cliffside Park in their black Nissan minivan to attend a party at TJ's Boom Bar. The event was a "moms' night out" for the purpose of allowing Pierro and several other women, including Homsi, to catch up with another friend, Christine Perrone, who was visiting from Texas. On arrival, defendant sat by himself with a large black umbrella or stood near Pierro while she socialized with her friends. A friend, Dominick Visconti, stopped by and joined the group.

Pedro Santiago was at the same bar with Hector Tito Zabala and several other men; they were there to celebrate someone's birthday. According to Santiago, Zabala grew progressively more intoxicated as the night wore on.

Visconti, who first met Zabala several months earlier, also observed that Zabala was drunk. According to Pierro, Zabala intruded on her and defendant at one point. Zabala said he was "strapped," meaning he was armed. Defendant found Zabala off-putting.

Santiago chatted with Homsi and Perrone. Zabala, whose behavior grew increasingly obnoxious, attempted to socialize with the women. He flirted with Homsi and Perrone and offered to buy them drinks. Homsi declined; Perrone accepted. Homsi and Perrone were not overly bothered by Zabala, whose drunken behavior they found goofy but not threatening. Santiago felt it necessary to tell Zabala to "chill out."

Pierro and her friends, as well as Santiago and Zabala, stayed at the bar until around 2:00 a.m., when it closed. The entire group moved outside, still laughing and talking; they gradually moved up the street. At the corner there was a bus stop bench on which Zabala sat, slumped over. It appeared to Homsi and Perrone that Zabala had had too much to drink. Santiago urged him to go home and offered to call a cab, but Zabala still wanted to party. Santiago did not think Zabala was behaving in a nasty or aggressive manner.

A-4923-16T4

At one point Pierro and defendant approached Santiago and tried to sell him some marijuana. Santiago was not interested but either gave his or took defendant's phone number to end the conversation.

When Zabala got up from the bench, Pierro and her friends sat down. Defendant, who was standing behind Pierro, wanted to go home, but Pierro asked him to wait a little longer. According to Pierro, Zabala stepped in front of her at that moment and said, "oh, I like that." Although Pierro was neither alarmed nor frightened by this, defendant immediately intervened and said, "Okay, that's my wife." According to Pierro, Zabala then moved behind the bench, away from her.

While Pierro was still sitting on the bench facing forward, she heard Zabala loudly call defendant "the N-word" behind her back; she also heard Zabala say: "I'll take whatever you got." Pierro heard a scuffle of feet and then gunshots. She turned quickly and saw a flash of light by defendant's hand, which was pointed down. She ran to defendant and saw Zabala on the ground, bleeding. Pierro and defendant then walked to their car. Santiago watched defendant walk away from Zabala.

Raymond Jenkins, a taxicab driver, was inside the taxi company office across the street from TJ's Boom Bar, facing the bus stop bench when he heard

5

gunshots. He saw a dark-skinned man standing with another man lying at his feet and others running from the scene. The dark-skinned man Jenkins saw was holding something black and silver in his hand. Jenkins watched as that man calmly walked away with a white woman; they both got in a car and drove off.

Police arrived; their attempts to revive Zabala proved unsuccessful. An autopsy later revealed that Zabala had been shot five times at close range, once to the chest, twice to the abdomen, once to each of his hands and once to his left forearm. The fatal shot to his chest was fired after Zabala had collapsed, and death occurred soon after. Zabala's blood alcohol content at the time of his death was .235; he also had marijuana metabolites in his system.

The police interviewed bystanders and quickly obtained the names and descriptions of defendant and Pierro and used motor vehicle records to learn where they lived. Meanwhile, Pierro had driven home with defendant who told her he was intoxicated and "felt woozy." During the trip, they stopped so defendant could change their flat tire. Perrone called to check on them and Pierro hysterically said, "he's going to get in trouble . . . [h]e's the father of my kids," before defendant began yelling and Pierro hung up. According to Pierro, defendant then told her to calm down and asked her whether she would rather he were dead.

6

Upon arriving home, Pierro called her friend Xiomara Falu and asked if she and defendant could come over. When they arrived at Falu's two-bedroom Garfield apartment, defendant was carrying a black duffle bag. He spent the night at Falu's apartment; Pierro went back home to stay with the children.

In the morning, Pierro and the children returned to Falu's home. Pierro called Perrone to find out if anything happened and whether police were involved. Perrone told Pierro the police had contacted her and that they wanted to question defendant.

Pierro and defendant left their infant with Falu and took the toddler to the Lodi home of their longtime friend Jessica Lewis. While there, Pierro used Lewis's iPad and learned Zabala was dead. She then had a whispered conversation with defendant, following which defendant and Pierro left, leaving the toddler with Lewis.

Defendant and Pierro returned to Falu's home. Pierro and Falu then went to retrieve the toddler, leaving defendant and the infant at Falu's apartment. Pierro and Falu drove with the toddler to a Burger King in Lodi. They were spotted there by police, who had traced Pierro's cell phone to Lodi. Falu told the police that defendant and the infant were at her Garfield apartment. Because defendant was considered armed and dangerous, the police sent a SWAT team

A-4923-16T4

to Falu's apartment; there, they arrested defendant who had been lying down with the infant in the apartment's second bedroom.

Police searched Falu's apartment and found on the bed in Falu's master bedroom, a .380 caliber handgun and ammunition, a Foot Locker bag, and a shoebox containing a digital scale, glassine baggies, and a large bag of what was later determined to be marijuana. Falu denied she owned any of these items. Police also searched defendant's minivan and found a large black umbrella and a blown-out tire. At the scene of the shooting, police recovered five shell casings, which were later determined to have come from the handgun found in Falu's apartment.

Police also obtained video from the surveillance camera at a nearby grocery store. This video captured images of a man with an umbrella and a gun, a flash, and another man falling to the ground.

At trial, Andre DiMino, an expert in computer and digital forensics, explained that he recovered deleted texts from phones used by defendant and Pierro. These texts appeared to show that defendant and Pierro were selling marijuana to various customers. DiMino also determined that defendant made several calls of momentary duration to one number, later determined to be Santiago's, at about 2:30 a.m. on July 8, 2012.

Detective Douglas Rager of the Bergen County Prosecutor's Office testified that based upon his law enforcement experience, the vegetation, digital scale and glassine baggies found in Falu's bedroom suggested that whoever owned these items was involved in marijuana distribution.

Detective Michael Perez, the State's expert in drug distribution, testified that: (1) a shoebox and sneaker store bag, like the ones found on the bed in Falu's bedroom, were often used to conceal marijuana; (2) the digital scale and baggies found were of the type used by drug distributors; (3) the large package of marijuana found in Falu's bedroom contained more than expected for individual use; and (4) the individual who possessed the marijuana, the scale and the baggies was more likely selling the marijuana than using it personally. Perez also reviewed the texts between defendant and Pierro, identified words contained therein that were associated with drug dealing, and interpreted the messages in that context.

Defendant testified on his own behalf. He asserted that, on the evening of July 7, 2012, he agreed to accompany Pierro to the bar to visit with Perrone and that he took his gun "for protection" because he believed Cliffside Park was unsafe. He denied that he or Pierro brought marijuana with them.

Defendant also testified that while he and Pierro were sitting at a table, Zabala approached and sat down in front of Pierro. Defendant did not know who Zabala was and was unhappy with this development, but Zabala told defendant that he was "strapped" and that defendant would have to put up with him. Defendant did not think Zabala was drunk.

Defendant told Zabala that Pierro was his wife and that Zabala should go back to his friends. Zabala moved away but later returned. Defendant again told Zabala to rejoin his friends. Defendant felt that Zabala was singling him out in a threatening way and tried to intimidate him.

When the bar closed, defendant went outside with Pierro and her friends. He denied speaking with Santiago or giving him his phone number. Defendant also denied that he was intoxicated.

While Pierro was sitting on a bench, defendant leaned over from behind and asked if they could leave. Pierro said she wanted to stay a little longer. According to defendant, Zabala instead moved behind him and said, "Nig[g]er I'm a – show you what – what I got" or "Nigger, I'll take what you got," or something to that effect. Defendant turned around and saw Zabala reaching for a revolver sticking out of his waistband. Defendant was afraid and stepped back,

drew his own gun and fired at Zabala's hand to prevent him from pulling the gun out. He continued firing at Zabala even when Zabala was on the ground.

Defendant insisted he had not been trying to kill Zabala. He stated, though, that he found Zabala's conduct to be "an affront to humanity." He also denied that the marijuana and other drug paraphernalia found in Falu's bedroom belonged to him. He did, however, acknowledge ownership of the gun.

## II

Defendant was indicted and charged with:

- first-degree murder, N.J.S.A. 2C:11-3(a)(1)(2);

- second-degree possession of a weapon for an unlawful purpose, N.J.S.A. 2C:39-4(a);

- second-degree unlawful possession of a weapon, N.J.S.A. 2C:39-5(b);

- two counts of third-degree possession of a controlled dangerous substance (CDS) with intent to distribute, N.J.S.A. 2C:35-5(a)(1) and -5(b)(11);

- third-degree CDS possession near or on school property, N.J.S.A. 2C:35-7;

- two counts of fourth-degree CDS possession, N.J.S.A. 2C:35-10(a)(3);

- second-degree possession of a weapon during the course of a CDS-related offense, N.J.S.A. 2C:39-4.1; and

11

- second-degree endangering the welfare of a child, N.J.S.A. 2C:24-4(a).[1]

In March 2016, defendant moved to sever those counts pertaining to the murder and weapons offenses from the counts related to the drug and endangerment offenses. His motion was denied.

On April 5, 2016, the trial court permitted defendant's private counsel to withdraw from the case after it appeared he would have to testify as a witness, and an attorney affiliated with the Office of the Public Defender was appointed as substitute counsel. Because of this late substitution, the trial was adjourned from March to October 2016, to allow new counsel to prepare for trial. On October 18, 2016, defendant unsuccessfully moved for the removal of his new attorney and for an adjournment of the trial.

Defendant was tried in October, November and December 2016. On December 21, 2016, the jury acquitted defendant of CDS possession near or on school property and child endangerment but found him guilty on all remaining counts.

---

[1] Pierro was also charged under this indictment with the same drug offenses, as well as third-degree hindering and second-degree child endangerment. Pursuant to a plea deal, Pierro pleaded guilty to hindering and agreed to testify truthfully for the State at defendant's trial in the hopes of being sentenced to probation.

A-4923-16T4

Because defendant filed civil suits against both his attorneys, his sentencing was postponed for six weeks. Sentencing was again adjourned for another week because bomb threats were apparently directed at the Bergen County Courthouse and the Bergen judiciary.

The trial judge held an in-chambers conference after the first adjournment of the sentencing. Based on comments made by the judge at that time, defendant moved for recusal, claiming the judge's comments in chambers demonstrated a bias against him. This motion was denied.

After appropriate mergers, the judge sentenced defendant to: a fifty-year prison term, subject to the No Early Release Act (NERA), N.J.S.A. 2:43-7.2, on the murder conviction; a consecutive five-year prison term on the conviction for third-degree CDS possession with the intent to distribute; and a ten-year consecutive prison term with five years of parole ineligibility on the conviction for possession of a firearm in the course of a CDS-related offense.

III

Defendant appeals, arguing:

> I. THE TRIAL COURT ABUSED ITS DISCRETION IN DENYING DEFENDANT'S MOTION TO SEVER THE MURDER AND WEAPONS CHARGES FROM THE WHOLLY UNRELATED CDS CHARGES, THEREBY DENYING THE DEFENDANT A FAIR TRIAL.

13

II. DEFENDANT WAS DEPRIVED OF HIS RIGHT TO COUNSEL WHEN THE TRIAL COURT REFUSED TO ALLOW A SUBSTITUTION OF COUNSEL BASED ON THE COMPLETE BREAKDOWN OF DEFENDANT'S RELATIONSHIP WITH HIS ATTORNEY.

III. THE TRIAL COURT DEPRIVED DEFENDANT OF HIS RIGHT TO PRESENT A DEFENSE BY PROHIBITING THE DEFENSE FROM CROSS-EXAMINING DOMINIC VISCONTI ABOUT THE VICTIM'S AGGRESSIVE BEHAVIOR.

IV. THE DRUG EXPERT'S TESTIMONY SHOULD HAVE BEEN BARRED BECAUSE IT CONSTITUTES AN INADMISSIBLE OPINION ON DEFENDANT'S GUILT THAT INVADES THE PROVINCE OF THE JURY.   IN ADDITION, THE PREJUDICE TO DEFENDANT WAS EXACERBATED WHEN A POLICE OFFICER WHO WAS NEVER EVEN QUALIFIED AS AN EXPERT GAVE A SIMILAR OPINION ON DEFENDANT'S GUILT (Not Raised Below).

V.   THE   JUDGE   SHOULD   HAVE   GRANTED DEFENDANT'S MOTION FOR RECUSAL.   THE MATTER SHOULD, THEREFORE, BE REMANDED FOR A NEW SENTENCING IN FRONT OF A DIFFERENT JUDGE.

VI. THE TRIAL COURT ABUSED ITS DISCRETION IN SENTENCING DEFENDANT TO A FIFTY-YEAR TERM WITH AN 85% PERIOD OF PAROLE INELIGIBILITY; A CONSECUTIVE   FIVE-YEAR   TERM;   AND   A CONSECUTIVE TEN-YEAR TERM WITH A FIVE-YEAR PERIOD OF PAROLE INELIGIBILITY BECAUSE A PROPER APPLICATION OF THE AGGRAVATING FACTORS DOES NOT SUPPORT SUCH A SENTENCE.

As mentioned at the outset, we are satisfied that the trial judge erred in denying defendant's motion to sever the CDS and child endangerment charges from the murder and weapons charges. Consequently, we need not reach defendant's second, fourth and sixth arguments. We do, however, reach the third argument to remove any doubt about that testimony at the next trial. And we also reach the fifth argument because we agree the trial judge should have recused herself and, as a result, all future proceedings should take place before a different judge.

IV

In considering the judge's denial of defendant's severance motion, we initially observe that the version of events offered by the State at trial consisted of separable incidents, some with no logical connection to others. Prior to trial, defendant moved for a severance of the CDS charges (arising from events preceding and following the shooting) and the child endangerment charge (which arose from events that followed the shooting) from the murder and weapons charges. We agree that the judge erred in denying the severance motion.

According to Rule 3:7-6, two or more offenses may be joined if the offenses are "of the same or similar character or are based on the same act or transaction or on 2 or more acts or transactions connected together or

constituting parts of a common scheme or plan." <u>Rule</u> 3:15-2(b) imbues trial judges with the authority to sever offenses when a joint trial will result in prejudice to the defendant.

The critical inquiry is whether, if the charges were tried separately, "evidence of the offenses sought to be severed would be admissible under [N.J.R.E. 404(b)] in the trial of the remaining charges." <u>State v. Alfano</u>, 305 N.J. Super. 178, 191 (App. Div. 1997) (quoting <u>State v. Chenique-Puey</u>, 145 N.J. 334, 341 (1996)); <u>accord</u> <u>State v. Sterling</u>, 215 N.J. 65, 73 (2013). That is, "[i]f the evidence would be admissible at both trials, then the trial court may consolidate the charges because 'a defendant will not suffer any more prejudice in a joint trial than he would in separate trials.'" <u>Chenique-Puey</u>, 145 N.J. at 341 (quoting <u>State v. Coruzzi</u>, 189 N.J. Super. 273, 299 (App. Div. 1983)).

In moving to sever the murder and weapons offenses from the CDS and endangerment offenses, defendant argued that the murder charge predominated, defendant would be greatly prejudiced by the admission of testimony regarding the drug charges, and the jury would be inflamed by the inclusion of the endangerment charge. The prosecutor argued severance was unwarranted because all the offenses occurred on the same day and the same evidence would have to be introduced at two separate trials.

By way of a written opinion, the judge briefly explained the rationale for denying severance:

> the charges arise from the same transaction. The actions that allegedly took place on July 8, 2012 occurred over the course of less than a day. The defendant allegedly shot the victim at approximately 2:40 a.m. and was arrested that evening around 10:20 p.m. Additionally, the murder and weapons charges bear a direct relation to the drug and child abuse offenses. First, the State alleged that the defendant had the weapon on his person at the bar where he attempted to sell the drugs. Then, when the . . . SWAT team arrested the defendant, the same gun and drugs were in his vicinity, while his child was on his lap. The proofs, including the homicide, guns, drugs and [defendant's] flight from the police, are the very circumstances that the State alleges place the child in harm's way. Clearly, there is sufficient overlap between the charges.

In appealing, defendant continues to insist he was denied a fair trial when the trial court wrongly "combine[d] two trials into one" because there was an absence of commonality between the murder/weapons offenses and the CDS/endangerment offenses. In defendant's view, since one set of crimes added no probative value to the other, and vice versa, their joinder served only to improperly suggest to the jury that defendant had a criminal disposition and likely committed all of the offenses of which he was accused.

Admittedly, all the charged offenses allegedly occurred in a short window of time. In addition, defendant was alleged to be in possession of the weapon

17

used to shoot Zabala as he and Pierro attempted to sell drugs at TJ's Boom Bar hours prior to the shooting. And the police found the same weapon, as well as CDS, drug paraphernalia and the allegedly-endangered child when they arrested defendant at Falu's apartment. These circumstances might suggest a nexus among all the charges.

But, on closer analysis, we agree with defendant that any link joining all these charges together was superficial at best. More to the point, the trial judge failed to conduct a <u>Cofield</u>[2] analysis, which is required for any disposition of a severance motion. So, we reverse the order denying severance and remand for a new trial on the murder/weapons charges and a separate new trial on the surviving CDS charge.

Again, the central question in any severance inquiry is whether, if the charges were tried separately, evidence of the offenses sought to be severed would be admissible under N.J.R.E. 404(b) in the trial of the remaining charges. <u>Chenique-Puey</u>, 145 N.J. at 341. Severance would not be required if it could be said that the evidence would be admissible at both trials because the defendant would not suffer any more prejudice in a joint trial than he would at separate trials. <u>Ibid.</u>; <u>see also</u> <u>Coruzzi</u>, 189 N.J. Super. at 299. The <u>Chenique-Puey</u>

---

[2] <u>State v. Cofield</u>, 127 N.J. 328, 338 (1992).

admonition requires that the judge considering the severance motion conduct a Cofield analysis. That is, the judge here was required to determine whether evidence about the CDS/endangerment charges would be admissible in a trial on the murder/weapon charges, and vice versa. As noted, the judge never employed the Cofield test; even if we were to view expansively the judge's rationale – which we quoted in its entirety above – at best, the judge considered only the second half of Cofield's second prong, when the judge recognized that all the offenses were alleged to have occurred closely in time. The judge's rationale, however, provided no inkling of her view of the other part of the second prong or the other three prongs. That failure alone requires a reversal of the order denying the severance motion. But we go further and conclude that had the judge conducted the proper analysis, the only option available was to grant the motion.

N.J.R.E. 404(b) allows for the admission of evidence of other crimes or wrongs for one of the reasons delineated in the rule – which will be discussed shortly – but not to prove "the disposition of a person in order to show that such person acted in conformity therewith." In determining the analysis required by N.J.R.E. 404(b), the Cofield Court provided four factors to be considered:

> 1. The evidence of the other crime must be admissible as relevant to a material issue;

2.  It must be similar in kind and reasonably close in time to the offense charged;

3. The evidence of the other crime must be clear and convincing; and

4. The probative value of the evidence must not be outweighed by its apparent prejudice.

[127 N.J. at 338.]

As mentioned, there is no doubt that all the crimes charged were "reasonably close in time" and the judge's decision appears to lean heavily on that circumstance. It is also appropriate to recognize there is also an overlap of sorts between the murder/weapons offenses and the CDS/endangerment offenses in that defendant was charged with possession of a weapon during the course of a CDS-related offense; that overlap, however, related only to defendant's possession of a weapon. So, to the extent the prosecution would have sought to offer evidence about one of these "other crimes" in order to prove defendant's possession of a weapon in the crime being tried, the circumstance here is that defendant did not dispute his possession of the weapon and, in fact, his defense to the murder charge was never that he was not in possession of a weapon.

Instead of the few superficial connections between these two groups of offenses, we find the Cofield test – when properly applied – would have led the trial judge to grant severance. The first prong required consideration of whether

A-4923-16T4

the other crime would be relevant as to a material issue. In other words, the judge was required to determine that evidence of the CDS or endangerment charges would be relevant to a material issue in the prosecution of the murder and weapons offenses.[3] N.J.R.E. 404(b) describes how evidence of other crimes, wrongs or acts may be relevant, "such as proof of motive, opportunity, intent, preparation, plan, knowledge, identity or absence of mistake or accident."

There was nothing about the evidence offered to prove the CDS charges that would suggest a motive for shooting Zabala. Indeed, the conduct leading to the charge of endangerment and some of the CDS offenses occurred <u>after</u> the shooting. It cannot be seriously argued that the post-shooting offenses revealed a motive for the shooting. And evidence of the pre-shooting CDS offenses suggests no motive for the shooting. The prosecution did not assert – and certainly had no evidence to show – that the shooting occurred during the course of a CDS transaction or that the shooting was motivated because defendant and Zabala were in a dispute about a CDS transaction.

The other crime evidence also had no bearing on the other purposes for which N.J.R.E. 404(b) evidence might be admitted, such as "opportunity, intent,

---

[3] We put aside, for the moment, whether evidence of the murder and weapons charges would have been admissible in a trial of the CDS and child endangerment offenses.

preparation, plan, knowledge, identity or absence of mistake or accident."  There was no dispute that defendant was in possession of the weapon used to shoot Zabala nor was there any dispute that defendant shot Zabala.  The central dispute concerned the reason for the shooting.  The CDS and endangerment offenses provided no probative value in the murder case.

Turning to Cofield's second prong, it is true, as we have already observed, that all the offenses occurred "reasonably close in time," but the second prong also requires that the other crime evidence "be similar in kind."  Again, because there was no assertion that defendant shot Zabala because of some CDS dispute, there is nothing about evidence of the pre-shooting and post-shooting CDS and endangerment offenses that was "similar in kind" to the shooting.  All that the prosecution – even now – can argue is the nearness in time and the argument, also adopted by the trial judge, that all the evidence was part of the same "narrative" because the events occurred reasonably close in time.  There is no difference between this contention and the "res gestae" argument jettisoned by our Supreme Court in State v. Rose, 206 N.J. 141 (2011).  Moreover, the State's argument that the evidence of the CDS charges or the endangerment charge are "intricately intertwined" – stripped of the circumstance that they all allegedly occurred within the same reasonable time period – is simply inaccurate.  The

"narrative" about the CDS offenses could be told without reference to the shooting, and vice versa.

The third prong requires consideration of whether the evidence of the other crime was "clear and convincing." The judge never analyzed the evidence and applied that standard.[4] For present purposes, we assume the prosecution had clear and convincing evidence of these other crimes.

Despite our assumption that evidence of the other bad acts was clear and convincing, there is no doubt that any probative value – as to which we find none – was outweighed by the "apparent prejudice" of the admission of the other bad act evidence. Proving that defendant was attempting to sell marijuana in the bar prior to the shooting, or even that he and Pierro were attempting to make a sale to Santiago within minutes of the shooting, has no relevance to defendant's shooting of Zabala or his defenses to that murder charge. And, surely, there was

[4] Interestingly, the jury acquitted defendant of the school zone CDS charge, which was alleged to have occurred in Cliffside Park prior to the shooting, and the child endangerment charge, which was alleged to have occurred in Garfield after the shooting. Arguably, those charges could be viewed as being based on evidence that was less than clear and convincing since the jury was not convinced. To be fair, it might similarly be argued that the other offenses could be clearly and convincingly established because the jury found defendant committed those offenses beyond reasonable doubt. But, we also do not know what role the evidence of the CDS offenses had on the murder charge and vice versa. Of course, that is all speculative. The point here, however, is that the judge did not analyze this prong at all.

no relevance in any aspect of the murder charge that would have been illuminated by evidence of the CDS and endangerment offenses alleged to have been committed <u>after</u> the shooting.[5]

Even if some arguable basis could be presented for finding probative value in any of these other crimes in the prosecution of the murder and weapons offenses, the prejudicial effect would certainly outweigh that slim probative value. In the final analysis, the evidence of other crimes served only to suggest to the jury that defendant was a lawbreaker "act[ing] in conformity" with that disposition when he shot Zabala – the very thing for which N.J.R.E. 404(b) evidence may not be used.

To summarize, we reverse the order denying severance because the judge erred in not conducting a <u>Cofield</u> analysis. Moreover, because a <u>Cofield</u> analysis would have unmistakably led to a determination that defendant was entitled to separate trials,[6] we reverse and remand for that purpose.

---

[5]  It should also be plainly obvious that evidence of the murder and weapons charges would undoubtedly have been excluded if offered in a prosecution of the CDS and endangerment charges because of the incendiary nature and tenuous link between the murder and the CDS and endangerment charges.

[6]  Our analysis focused on the admissibility of evidence of the CDS and endangerment charges in a trial on the murder and weapons charges. The other question – whether evidence of the alleged murder and weapons offenses would have been admissible in a trial on the CDS and endangerment offenses – brings the same result. It is unimaginable that there was anything about the evidence

24

V

In his third point, defendant argues that the judge improperly curtailed his cross-examination of Visconti. Because the matter has to be retried, we express our disagreement with defendant's argument because this issue is likely to be repeated at any new trial that follows.

Prior to Visconti taking the stand, the State moved in limine to bar the defense from cross-examining Visconti about an earlier incident Visconti had witnessed. On that earlier occasion, he saw Zabala at a Cliffside Park barber shop. Zabala was then, according to Visconti, drunk and behaving in a loud and obnoxious manner to the point that his friends had to calm him down. In opposing the State's motion, defendant argued that this testimony would

---

of the shooting that would prove a motive, identity or the other stated grounds for admission of other crimes evidence under N.J.R.E. 404(b), in the CDS and endangerment offenses, particularly in the pre-shooting CDS charges. The State has argued that the fact that defendant was wanted in connection with the murder and was armed and with his infant child when arrested suggests that the reason for his avoiding the police – that he was wanted for murder – was necessary to prove the child endangerment offense. It was enough in that case – for which, we would again note, defendant was acquitted – for the State to show that defendant was wanted and reasonably believed to be armed and dangerous without needing to prove the specific reason a SWAT team was sent to arrest him. Without going through each of the four Cofield factors again, it seems clear to us that any arguable probative value of the other crimes in a trial of the CDS and endangerment offenses would not outweigh the obvious prejudice that evidence would have caused.

A-4923-16T4

demonstrate Zabala had a propensity for behaving a certain way when drunk and this story would support defendant's claim that he acted in self-defense.

The trial judge concluded that this testimony about Zabala's prior bad acts was inadmissible under N.J.R.E. 404(b) and Cofield because there had been no showing that this information: (1) was relevant to a disputed material issue; (2) was similar in kind and close in time to the homicide; (3) met the clear and convincing evidentiary standard; and (4) was of significant probative value that outweighed any prejudice to the State. Defendant moved for reconsideration, arguing the judge applied the wrong legal standard. The judge directed the defense to have Visconti appear for a N.J.R.E. 104 hearing, but Visconti refused to come to court and the defense was unable to serve him with a subpoena. The judge decided to accept defense counsel's proffer as to what Visconti's testimony would be and reconsidered the ruling in light of State v. Weaver, 219 N.J. 131 (2014).

Weaver recognizes that a defendant is entitled to advance in his defense similar other-crimes evidence that tends to "refute his guilt or buttress his innocence of the charge made." 219 N.J. at 150 (quoting State v. Garfole, 76 N.J. 445, 453 (1978)). The standard for introducing defensive other-crimes evidence is lower than the standard imposed on the State when it seeks to use

such evidence against a defendant.  Garfole, 76 N.J. at 452-53.  This is because, when used against the State's case, the defendant is offering the proof for exculpatory purposes and, so, there is no risk of prejudice.  State v. Cook, 179 N.J. 533, 566 (2004).

The standard of admissibility simply turns on the relevance of the evidence to defendant's guilt or innocence.  Weaver, 219 N.J. at 150; Garfole, 76 N.J. at 452-53.  But the trial judge must still determine that the probative value of the evidence is not substantially outweighed by the risk that its admission will either unduly consume time, likely confuse the issues, or mislead the jury.  Weaver, 219 N.J. at 151.  Such a ruling is highly discretionary.  Cook, 179 N.J. at 567.

The judge determined that the issue of self-defense, as asserted here, raised questions about whether defendant

> reasonably believed that such force was necessary to protect himself against death, or serious bodily harm. N.J.S.A. 2C:3-4(b)(2).  Therefore, it is the defendant's state of mind at the time of the shooting that is of critical importance.  There is no indication that the defendant had any knowledge of the victim's prior incident where he "was called out" for "rude and obnoxious" behavior.  The court does not find that this "prior bad act" evidence of the victim is probative or relevant to his defense.  The proffered testimony of Dominic Visconti was a specific act of the victim on a

prior occasion, and does not comport with the requirements of <u>N.J.R.E.</u> 405, or <u>N.J.R.E.</u> 404(a)(2).

Defendant maintains that had they heard Visconti's testimony about this earlier incident, the jurors could have concluded that, because defendant "frequented the same barber shop," he too was aware of this "prior instance of aggressive behavior" and that Zabala's prior actions had a bearing on the reasonableness of defendant's actions on July 8, 2012. But defendant has not cited any evidence in the record to support his assertion that defendant "frequented the same barber shop," or that there was otherwise a reasonable basis upon which a jury could find that defendant was aware of the incident he wanted to elicit from Visconti. Without that, there was no logical nexus between Visconti's story about this barber shop incident and defendant's alleged use of self-defense.

We conclude that, as the issue was then presented and based on the record as it then existed, the trial judge acted within her discretion in precluding defendant's cross-examination into this earlier event allegedly witnessed by Visconti.

## VI

Defendant argues that the judge should have recused herself prior to sentencing him.

A-4923-16T4

Defendant was originally scheduled to be sentenced in March 2017. That proceeding was postponed to April 28, 2017, because defendant had filed lawsuits against his original private attorney and the deputy public defender who represented him at trial, as well. The April sentencing here was interrupted and adjourned when bomb threats forced the court house's closure. At a conference a few days later, the judge scheduled sentencing to occur on May 4, 2017. The judge also ordered that defendant appear by way of video-conferencing.

After the conference, defense counsel filed motions seeking: (1) reconsideration of the court's order precluding defendant's physical presence at his sentencing; and (2) the recusal of the trial judge because of her allegedly unwarranted suspicions of, and bias against, defendant, as expressed during the May 2 conference. In a supporting certification, defense counsel asserted that, "without any substantive proof" the judge "kept referring to the 'coincidental' delays in the completion of this case," such as defendant's

> attempt to change counsel, his civil complaint against his former attorney and the [deputy public defender], and the "back-and-forth" leaving the courtroom of someone on the 4/28/17 date which was being investigated as the cause of the court evacuation. In addition, the [the trial judge indicated] that the defendant would not . . . further delay this matter and that this was coming from the "top" or some higher up.

Defense counsel believed it clear the judge had baselessly concluded that defendant was behind the bomb threats and was deliberately delaying his sentencing. Defense counsel faulted the judge for insisting, based on this "wild speculation," that defendant appear only by video conference at his own sentencing. On receipt of defense counsel's motions, the judge reconsidered and reversed the decision to require defendant's appearance by video conference.

At the outset of defendant's sentencing hearing, with defendant in attendance, the judge explained why she had initially concluded that remote sentencing was warranted and why that decision had been reconsidered, emphasizing that at no point had she ever made a finding that defendant was behind the bomb-threat disruption.

The judge then proceeded to deny the recusal motion, explaining:

> I want to make it very clear that, first of all, this court has made, or arrived at no opinion on the matter in question, nor . . . is the impartiality of this court affected in any way by the events. My concern is to sentence [defendant] . . . in a timely fashion – and to assure the victim's closure in this matter, as well. The matter has gone on for too long. There is no proof . . . that the defendant, or anyone else at his behest, was involved in the threats made to the [j]udiciary, or to the courthouse, or to the [c]ounty buildings today, and I add that, as well.
>
> Moreover, this [c]ourt does not impute the threats to the defendant or any of his family members, friends or

acquaintances. That is an issue for the State Police or the Bergen County Prosecutor's Office to investigate. The [c]ourt makes absolutely no findings and does not impute in any way the threats made. The [c]ourt is fully confident that it can weigh the applicable aggravating and mitigating factors presented and arrive at a just sentence, without regard to Friday's events. Further delay is neither appropriate nor fair to the victim's family, who have traveled to this courthouse for a third time, after having waited for closure for almost five years. The defendant's motion for the [c]ourt to recuse itself is denied.

A judge should not preside over a proceeding if it does not appear the judge can be wholly disinterested, impartial, and independent. State v. Muraski, 6 N.J. Super. 36, 38 (App. Div. 1949). The Supreme Court has held that recusal is required when "a reasonable, fully informed person [would] have doubts about the judge's impartiality." State v. Dalal, 221 N.J. 601, 606 (2015) (quoting DeNike v. Cupo, 196 N.J. 502, 517 (2008)).

The judge's statements when discussing the rescheduling of the sentencing proceedings surely suggested her suspicions that defendant was behind the bomb threat. We are satisfied that, in applying the Dalal/DeNike standard, a reasonable, fully informed person would have doubts about the judge's impartiality. The judge's later insistence that she had formed no opinion on that question could not alleviate those concerns; it was enough that the judge

entertained the notion, and expressed it to counsel, to form a doubt about her impartiality in the mind of a reasonable, fully informed individual.

\* \* \*

To summarize, because the trial judge erred in denying defendant's motion to sever, we vacate the judgment of conviction and remand for separate trials in conformity with this opinion. We also direct that another trial judge preside over all future proceedings. We do not retain jurisdiction.

I hereby certify that the foregoing is a true copy of the original on file in my office.

CLERK OF THE APPELLATE DIVISION

A-4923-16T4